DOREEN M. SMITH vs. BELL ATLANTIC & another.[1]

No. 03-P-1522.

Middlesex. October 4, 2004. - June 10, 2005.

Present: LENK, GRASSO, & COHEN, JJ.

*Anti-Discrimination Law,* Employment, Handicap, Damages. *Employment,* Discrimination. *Evidence,* Expert opinion. *Massachusetts Commission Against Discrimination. Words,* "Qualified handicapped person."

At the trial of a complaint brought by the plaintiff employee pursuant to G. L. c. 151B, § 9, alleging that the defendant employer failed to reasonably accommodate her handicap in violation of G. L. c. 151B, § 4(16), the evidence, taken in the light most favorable to the employee, permitted the jury to find that neither daily presence in the office nor travel was essential to the plaintiff's employment [711-714], and that allowing the plaintiff to do substantial amounts of her work at home was, in the circumstances, a reasonable accommodation that the defendant failed effectively to implement [714-717]; however, the trial judge was entitled to exercise her discretion to strike the opinion of the employee's medical expert, which lacked a specific factual foundation to support a causal connection between the employer's failure to accommodate and the permanent decline in the employee's health, and properly allowed the employer's motion for judgment notwithstanding the verdict as to the employee's claims for front pay and other future damages [717-720].

At the trial of a civil action alleging employment discrimination on the basis of handicap, the judge did not err in directing a verdict for the defendant employer on the plaintiff employee's claim for punitive damages, where on the facts presented, there was no basis for finding that the defendant intentionally or willfully violated the law or that its conduct was evil in motive [720-722]; further, the judge did not abuse her discretion in ruling that the jury's award of emotional distress damages was grounded in the evidence and within the range of just damages [723-724]; did not err in reducing the plaintiff's award of attorney's fees and costs [724-725]; and correctly calculated prejudgment interest [725-726].

At the trial of a civil action alleging employment discrimination on the basis of handicap on a continuing violation theory, the judge did not err in allowing the jury to consider events that occurred after the plaintiff had filed her original charge with the Massachusetts Commission Against Discrimination (MCAD), and which were never included in that charge, where nothing in G. L. c. 151B, §§ 5 and 9, required the plaintiff to refile

[1]NYNEX.

or amend her charge with the MCAD as a prerequisite to relying upon later incidents in support of an ongoing violation. [722-723]

CIVIL ACTION commenced in the Superior Court Department on June 5, 1998.

The case was tried before *S. Jane Haggerty*, J., and a motion for judgment notwithstanding the verdict was heard by her.

*Laura R. Studen* (*Shepard Davidson* with her) for the plaintiff.

*Barry A. Guryan* for the defendants.

COHEN, J. In this action brought pursuant to G. L. c. 151B, § 9, a jury awarded damages to the plaintiff, Doreen Smith, on account of the failure of her employer, the defendant telephone company (company), to reasonably accommodate her handicap, in violation of G. L. c. 151B, § 4(16). After concluding that the opinion of Smith's medical expert was deficient and had to be struck, the trial judge allowed the company's motion for judgment notwithstanding the verdict as to Smith's claims for future damages; however, the judge refused to disturb the jury's award for emotional distress suffered by Smith while she remained in the company's employ. Before us are the parties' cross appeals.

Smith's primary argument is that it was error to strike the opinion of her medical expert on the causal relationship between the company's failure to accommodate and the permanent decline in her health, and that, therefore, the jury's awards for front pay and other future damages should be reinstated. She also claims that the judge erred in directing a verdict for the company on her claim for punitive damages, that the judge improperly reduced her requested award of fees and costs, and that prejudgment interest was not properly computed.

The company argues that its motion for judgment notwithstanding the verdict should have been allowed in its entirety, because no reasonable jury could find that Smith was a "qualified handicapped person" and because it made accommodations that were reasonable as matter of law. The company also contends that Smith was not entitled to rely upon events that occurred under supervisors who had not been named in the charge Smith filed with the Massachusetts Commission Against Discrimination (MCAD), and that both the jury's award for

emotional distress and the judge's award of attorney's fees and costs were excessive.

We conclude that all of the challenged rulings were correct and, accordingly, affirm.

1. *Factual background.* We summarize the facts as the jury could have found them, adding details as needed during our discussion of the issues.

From 1978 to 1999, Smith was employed by the company in its various iterations.[2] Over the years, Smith, a college graduate with postgraduate engineering training, performed a number of different jobs and attained the position of "second-level manager." Smith succeeded in the workplace despite having a significant disability. When she was two years old, Smith contracted polio, and after a long and difficult recovery that included a year in an iron lung and many surgical procedures, she was left with paralysis in one leg and diminished use of the other.

As an adult, Smith ambulated using wrist-braced crutches, until 1992, when she began to experience increased fatigue, loss of body strength, and pain. She then started to use a scooter for all but short distances, transporting it in a large van equipped with hand controls and a lift. Eventually, Smith was diagnosed with post polio syndrome (PPS), a degenerative condition affecting some polio survivors.

PPS is a consequence of polio's effects upon nerve cells, some of which die, some of which are infected and weakened, and some of which remain normal. Functioning cells sprout more axons and try to compensate for the lost and weakened cells. Over time, these overworked cells start to die, and the patient experiences the symptoms of PPS. If the patient does not take care to avoid overexertion, PPS may accelerate. Individuals like Smith, who have diminished use of their legs, run the risk that overuse of their arms will result in wear and tear that eventually will compromise their ability to perform daily functions and live independently.

In 1993, Smith worked out of the company's Waltham office,

---

[2]During Smith's tenure, the company did business as New England Telephone, NYNEX, and Bell Atlantic.

but reported to a supervisor in Marlborough and traveled there on a regular basis. In May of that year, Smith was distressed to learn that she would have to work exclusively at the Marlborough facility. Smith lived in Dedham; her commute to Waltham had been only about twenty minutes, and parking was readily available. The longer drive to Marlborough was more fatiguing, and once she arrived, she often had trouble parking because there was only one van-accessible handicapped parking space, and people would park illegally and block access to her lift. When told of the move, Smith asked that she be allowed to continue using an office in Waltham, but she was required to relocate. She was not given an explanation for the transfer and knew of no reason why it was necessary.

From June 21, 1993, until June 17, 1994, Smith was out of work on medical leave, undergoing and recuperating from knee replacement and shoulder surgery. This was not the first time that Smith had taken medical leave for surgical procedures. Between 1978 and 1991, she had several operations, but according to Smith, her medical absences did not cause any work-related problems, no one discussed them with her, and she remained involved with the company while on leave. Her performance evaluations between 1990 and 1993 were favorable, indicating that, with few exceptions, she met or exceeded objectives.

During Smith's June, 1993, to June, 1994, absence, another employee took over her projects. When preparing to return to work, Smith asked if she could come back on a part-time basis (she still needed to attend physical therapy) and do some of her work from home. Her doctor supported her request and wrote a letter to the company's medical director requesting that Smith's commuting distance be decreased or that she be allowed to perform some of her duties at home. Robert Olson, Smith's supervisor, in conjunction with a company physician and the company's disability advocate, considered her request and agreed to it. Such arrangements were not unprecedented; there were other, nonhandicapped second-level managers who did almost all of their work from home.

When Smith returned to work, she was given a "special assignment" to perform asset measurement and planning. Smith's

project involved gathering and analyzing data, preparing reports, and reviewing the utilization of technology. In this position, Smith did not have supervisory responsibilities, but this, too, was not unique; there were other second-level managers on special assignments who did not supervise others. While it was necessary for her to do some traveling to company sites, the basic plan was for Smith to work at home at least two days a week and either at home or in Marlborough on the other days.

This arrangement did not work out as Smith had hoped. Because she did not have a home office, she frequently needed to travel to Marlborough to collect and print out data to analyze at home. Early on, Smith requested that she be provided with a computer, but none was forthcoming until 1995 when Olson gave her a laptop that could not reliably run Lotus Notes, an important communications program that she needed for her work. Eventually, Smith purchased her own equipment, including a computer, printer, fax machine, copier, software, and office furniture. She did not seek reimbursement for these items, because she believed that the company would be unwilling to pay for them. Despite her requests, she had no dedicated telephone access from her home to the company's network until 1997, when the company installed two "POTS" ("plain old telephone service") lines in her home, one for her fax machine and one for her computer. She was not supplied with high-speed access.

Smith's efforts to avoid wear and tear on her arms by minimizing her driving and the number of "transfers" that she needed to make (e.g., from her scooter to the car and back again) were frustrated by her frequent need to travel to the office and to vendors. She repeatedly informed Olson, the company disability advocate, and company doctors about her difficulties. She asked to be assigned to a location closer to home and, before she acquired it herself, to be given home office equipment. Dr. Birchette-Pierce of the company's medical department was supportive of Smith's requests, but changes were not forthcoming.

In early 1995, the company had Smith stay out of work for several weeks because Dr. Birchette-Pierce was of the opinion that Smith should not work without accommodation. Then, dur-

ing the first week of April, 1995, Dr. Ryan, the head of the company's medical department, called Smith and told her she would be fired unless she came to work the next day — informing her that it was her supervisor's responsibility to provide accommodations for her, and not the medical department's. Smith attempted to reach Olson; when she could not, she called the company's ethics hotline. Again she was informed that it was her supervisor's responsibility to provide reasonable accommodations. Smith came back to work on April 5, 1995, on a full-time basis.

Smith wrote to Olson informing him that failure to change her work location or work arrangements would compromise her health. When they met the following week, Olson told her that he would look into transferring her to a location that was within a one-half hour commute of Dedham. Subsequently, Olson transferred Smith to Boston, where he had other subordinates working for him. While based in Boston, Smith continued to report to Olson, but her commute to Marlborough was reduced to one day a week.

Although Smith's commute was improved by getting an office in Boston, she had considerable difficulty with parking, because her oversized van would not fit into covered garages, and open lots refused to take such a large vehicle. On one day in June, 1995, Smith was unable to find a parking spot that would allow her to gain access to her ramp and retrieve her scooter. She therefore attempted to walk from her van to the office on crutches, but was knocked down by another pedestrian and injured her ankle. This injury kept her out of work until late July, 1995, when she returned, initially part-time, but full-time as of October, 1995.

Shoulder surgery resulted in Smith losing considerable time from work during 1996, but in January, 1997, she again resumed full-time duties. In April, 1997, Smith had to have her knee surgery redone. She returned to work on a part-time basis at the end of November, and on a full-time basis the following year.

In late 1997 or early 1998, Smith was transferred back to the Marlborough office, where her supervisor was now William Haid. She was assigned to develop measurement packages for new departments, which involved determining what data needed

to be tracked and developing a system to collect it. According to Smith, with a functional home office, she could have performed ninety percent of her job at home. As it was, her home office was not adequate to the task.

Smith had a friend from work install Lotus Notes on the home computer that she had purchased and, for a short time, that was successful. But then the computer developed a virus, and Smith lost the ability to use the program. When she tried to get help from the company's information technology people, they refused because the company did not own the computer. Smith called a computer "doctor" and the computer company's technical support line. As she attempted to simultaneously hold the telephone and maneuver her computer, she lost her balance and tore her rotator cuff.

When Smith informed Haid about issues with her home office, he told her that she needed to address them herself. For example, when she requested that her home be designated a secure site so that she would be permitted access to certain databases, Haid did not object, but said that she should do it herself, even though this was beyond her capacity. Furthermore, under Haid, Smith again found herself stymied in her efforts to restrict her trips to the office. Instead of communicating with her electronically, Haid sometimes would leave notes on her desk, which she would need to retrieve by traveling to Marlborough; when she attempted to participate in meetings by conference call, Haid and others sometimes neglected to call her or failed to call her back after a break. Haid also once told Smith that people with disabilities have a place in the workplace, but that there are only certain jobs they are qualified to do.

Smith informed Haid that her lack of resources and support was resulting in a decline in her over-all productivity. She frequently worked extra hours because more time was required to complete the assignments she was given. Haid did not respond to these concerns, but in her 1998 performance appraisal, Smith was told that even though she exceeded expectations in some respects, she did not meet other performance objectives. One of the unmet objectives was to define a "skill set" for telecommuting. Smith had informed Haid that ac-

complishing that task would require significant training, but he had not offered any support in that regard. In connection with her performance appraisal, Smith also was told that her contributions were not comparable to those of other second-level managers. Smith felt that this was because Haid expected her to be able to set up and maintain her own home office while other managers were not responsible for keeping their computers online.

As of January, 1999, Smith again was working part-time, but resumed full-time work in March. By the end of 1999, however, despite the fact that she had always loved her job with the company, Smith came to the conclusion that she no longer could do her work effectively. She was too fatigued to travel and had a serious shoulder injury that required surgery. In June, 2000, after six months of short-term disability, Smith went out on total, permanent disability. She was then forty-seven years old.

2. *Procedural background.* Smith first pursued legal action against the company in December, 1995, when her requests for accommodations from Olson remained unresolved to her satisfaction. She filed a handicap discrimination charge with the MCAD against the company and Olson, claiming that they were not providing her with reasonable accommodations and had retaliated against her for requesting them. The charge was dismissed by the MCAD in November, 1998, on the ground that there was insufficient information to establish a violation.

Meanwhile, in June, 1998, Smith filed a complaint asserting the same claims in Superior Court. As the case proceeded, the issues were narrowed: a judge partially allowed the company's motion for summary judgment, dismissing Smith's retaliation claim; and Smith discontinued her claims against Olson. When the case was tried to a jury in May, 2002, it was limited to Smith's claim against the company for failure reasonably to accommodate her.

At the close of the plaintiff's evidence, the trial judge directed a verdict for the company on Smith's claim for punitive damages. As for compensatory damages, Smith contended that the company's failure to provide her with reasonable accommodations not only caused her to suffer emotional distress dur-

ing the final years of her employment between 1993 and 1999, but also accelerated her physical deterioration to the point where she no longer could work and had to go out on total disability.

The case was submitted to the jury on special questions. The jury found that Smith was a qualified handicapped person; that the company failed reasonably to accommodate her by providing her with an adequate home office, but that the company did not fail reasonably to accommodate her by providing her with a shorter commute and parking; and that fair compensation for her emotional distress from 1993 through 1999 was $207,000. The jury also found that the company's failure reasonably to accommodate Smith was a substantial contributing factor in rendering her unable to work after 1999. They awarded her $1,000,000 for lost future wages; $300,000 for future medical and life care costs; and $200,000 for emotional distress after she ceased working.

Before and during the trial, the company objected to the admission of the opinion testimony of Dr. Julie Silver, an expert on PPS and Smith's treating physician, who stated that the company's failure to accommodate was the major contributing factor leading to Smith's rapid deterioration and inability to work. The judge reserved the issue[3] and revisited it on the company's motion for judgment notwithstanding the verdict, ruling that Dr. Silver's opinion had to be struck because it was not adequately supported in methodology or fact. The judge further ruled that without Dr. Silver's opinion there was no basis for any award of future damages. She therefore allowed the company's motion for judgment notwithstanding the verdict except as to the jury's award for emotional distress damages during the period of Smith's employment between 1993 and 1999.

On Smith's motion, the judge awarded her attorney's fees and costs, but not in the amount requested. The judge declined to award fees and costs incurred at the MCAD prior to the fil-

---

[3]The judge considered the defendant's pretrial request for a *Daubert/ Lanigan* hearing to have been made belatedly and decided to evaluate the reliability of Dr. Silver's testimony at trial rather than by voir dire. See generally *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Commonwealth* v. *Lanigan*, 419 Mass. 15 (1994).

ing of Smith's lawsuit and decreased the fees and costs that she incurred during the Superior Court proceedings.

3. *Judgment notwithstanding the verdict.* We first consider the judge's rulings on the company's motion for judgment notwithstanding the verdict. In doing so, we are mindful that removing discrimination cases from the jury's hands is disfavored. *Labonte* v. *Hutchins & Wheeler*, 424 Mass. 813, 820 (1997). We view the evidence in the light most favorable to Smith, disregarding evidence favorable to the company; the verdict must be sustained if Smith has presented any evidence from which the jury reasonably could have arrived at their verdict. *Id.* at 820-821.

Pursuant to G. L. c. 151B, § 4(16), inserted by St. 1983, c. 533, § 6, it is an unlawful practice "[f]or any employer, personally or through an agent, to dismiss from employment or refuse to hire, rehire or advance in employment or otherwise discriminate against, because of his handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business." To recover for a violation of this section, Smith was required to show that she "was a 'qualified handicapped person' capable of performing the essential functions of [her] job with reasonable accommodation; [she] requested such accommodation, and [the company] refused to provide it; and, as a result of this refusal, [she] suffered some harm." *Alba* v. *Raytheon Co.*, 441 Mass. 836, 843 n.9 (2004). See MCAD Guidelines: Employment Discrimination on the Basis of Handicap Chapter 151B, § IX.A.3 (1998) (MCAD Guidelines).

At no stage in the case was there any dispute about the existence of Smith's handicap or her requests for accommodation. The issues in contention were, and remain, whether Smith was "qualified" as defined in G. L. c. 151B, § 1(16) — that is, whether she could perform the essential functions of her job with reasonable accommodation; whether, regardless of her status as a qualified handicapped person, the company

responded to her requests by providing accommodations that were reasonable as matter of law; and whether a causal connection was established between the company's failure to accommodate and Smith's future damages.[4]

a. *Essential functions.* The company argues that the evidence compelled the conclusion that when Smith requested accommodation in 1993, she no longer was physically able to perform the essential functions of her job. According to the company, attendance in the office and frequent travel were essential job functions that Smith no longer could manage. We agree with the trial judge that the evidence taken in the light most favorable to Smith permitted the jury to find that neither daily presence in the office nor travel was "essential" to her work as a second-level manager.

Determination of a job's essential functions requires an "individualized inquiry." *Cox* v. *New England Tel. & Tel. Co.*, 414 Mass. 375, 383 (1993). Whether or not job duties are "essential functions" is informed by the particular facts as well as by the guidelines adopted by the MCAD and Federal cases and regulations. See *Cargill* v. *Harvard University*, 60 Mass. App. Ct. 585, 594 (2004). The employer's judgment as to which functions are essential is a factor to be considered, but it is not controlling and is to be tested against other benchmarks such as the work experience of previous incumbents and the current "work experience of incumbents in the same or similar jobs." *Labonte* v. *Hutchins & Wheeler, supra* at 822.

The evidence established that Smith had been a second-level manager for seven years when she requested accommodation in 1993. As illustrated by her own work history, the company made use of second-level managers in a wide variety of functions. Between 1986 and 1989, Smith was assigned to work at a technical training center in Lisle, Illinois, where she developed software training and enhancements and provided support to regions all over the country. In 1989, she returned to Massachusetts where she worked in Boston on a one-year human resources project aimed at keeping women in technical

---

[4]The company did not rely upon an "undue hardship" defense. See G. L. c. 151B, § 4(16).

jobs. Her responsibilities included developing support groups, organizing focus groups, and developing training programs.

In 1991, Smith was assigned to manage planning. Working out of the company's Waltham office (but reporting to Olson in Marlborough), Smith oversaw several engineers and clerical support people doing long-range planning for telephone service in surrounding communities. In 1992, her job functions changed again when the company moved toward "integrated planning." Although she was still based in Waltham, Smith had to travel more frequently to the company's Marlborough facility. In 1993, Smith's job duties included supervision, career development and training of a team of seven engineers and support personnel, budget management, overseeing network equipment, asset and inventory management, and acting as a liaison for other corporate organizations and customers. Then, when she returned from medical leave in June, 1994, she was put on special assignment to perform asset measurement and planning, with no supervisory responsibilities.

Smith testified that the "basic functions" of her job as a second-level manager were to analyze data, generate reports, and be a resource for the other people in the department, and that travel was not an essential part of the job. She also testified that other second-level managers were assigned to special projects that did not require direct supervision or face-to-face interaction with other employees; she testified further that because technology made it possible to work remotely, other second-level managers who were not disabled were allowed to do substantial amounts of work from home.

From this evidence the jury reasonably could find that Smith and other second-level managers were rotated and utilized in many ways by the company — the common denominator being their ability to assimilate and analyze data, write reports, and make recommendations as to technical matters. The jury also could find that Smith was capable of performing these essential functions despite her deteriorating health. Finally, even though Smith was out on medical leave for substantial periods of time, she had consistently favorable performance appraisals, there were no complaints about her absences, and there was no evidence of hardship to the company resulting from her

unavailability. Thus, the jury reasonably could conclude that uninterrupted attendance was not an essential function of her job. Cf. *Garcia-Ayala* v. *Lederle Parenterals, Inc.*, 212 F.3d 638, 649-650 (1st Cir. 2000) (discussing prolonged medical leave as reasonable accommodation required under Americans with Disabilities Act [ADA]).

b. *Reasonable accommodation.* We turn now to the company's argument that it reasonably accommodated Smith as matter of law. The company maintains that, generally, employers have no obligation reasonably to accommodate by agreeing to work-from-home arrangements or providing home office equipment, and that Smith's case presents no exception. According to the company, it cannot be held liable for failing effectively to implement a form of accommodation that it was not obliged to provide.

The company relies heavily upon *Vande Zande* v. *Wisconsin Dept. of Admn.*, 44 F.3d 538 (7th Cir. 1995), decided under the ADA, 42 U.S.C. §§ 12101 et seq. (1995), in which Judge Posner wrote that "[a]n employer is not required to allow disabled workers to work at home, where their productivity inevitably would be greatly reduced." *Id.* at 545. Judge Posner observed that "[m]ost jobs in organizations public or private involve team work under supervision rather than solitary unsupervised work, and team work under supervision generally cannot be performed at home without a substantial reduction in the quality of the employee's performance." *Id.* at 544. However, he also recognized that "[t]his will no doubt change as communications technology advances," *ibid.*, and acknowledged that, in an exceptional case, an employee could "create a triable issue of the employer's failure to allow the employee to work at home." *Id.* at 545. Additional cases to the same effect include *Tyndall* v. *National Educ. Centers, Inc.*, 31 F.3d 209, 213 (4th Cir. 1994), and *Smith* v. *Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997).

Other Federal courts have been more receptive to the idea that a work-at-home arrangement may be found to be a reasonable accommodation under either the ADA or the Rehabilitation Act, 29 U.S.C. §§ 791 et seq. (1999). See, e.g., *Langon* v. *Department of Health & Human Servs.*, 959 F.2d 1053, 1060-1061 (D.C. Cir. 1992); *Humphrey* v. *Memorial Hosps. Assn.*,

239 F.3d 1128, 1136-1137 (9th Cir. 2001). Cf. *Cehrs* v. *Northeast Ohio Alzheimer's Research Center*, 155 F.3d 775, 782-783 (6th Cir. 1998) (temporary medical leave may constitute reasonable accommodation). But, as noted in a recent case from the United States Court of Appeals for the Tenth Circuit, the differences between the two camps are "largely illusory," since all of the relevant opinions allow for fact-specific, case-by-case analysis. *Mason* v. *Avaya Communications, Inc.*, 357 F.3d 1114, 1124 (10th Cir. 2004).

Thus, for example, in *Kvorjak* v. *Maine*, 259 F.3d 48, 55-58 (1st Cir. 2001), the United States Court of Appeals for the First Circuit upheld summary judgment for the employer only after considering the particulars of the plaintiff's job, concluding that the permanent, full-time, work-at-home arrangement he sought would not allow him to perform an essential function that required personal contact, interaction, and coordination with others in the workplace. Fact-specific inquiry also has been endorsed by the Equal Employment Opportunity Commission in a policy statement[5] and by the MCAD in its Guidelines.[6] The

---

[5]"An employer must modify its policy concerning where work is performed if such a change is needed as a reasonable accommodation, but *only if this accommodation would be effective and would not cause an undue hardship.* Whether this accommodation is effective will depend on whether the essential functions of the position can be performed at home. There are certain jobs in which the essential functions can only be performed at the work site — e.g., food server, cashier in a store. For such jobs, allowing an employee to work at home is not effective because it does not enable an employee to perform his/her essential functions. Certain considerations may be critical in determining whether a job can be effectively performed at home, including (but not limited to) the employer's ability to adequately supervise the employee and the employee's need to work with certain equipment or tools that cannot be replicated at home. In contrast, employees may be able to perform the essential functions of certain types of jobs at home (e.g., telemarketer, proofreader). For these types of jobs, an employer may deny a request to work at home if it can show that another accommodation would be effective or if working at home will cause undue hardship." (Footnotes omitted.) EEOC: Guidance on Reasonable Accommodation and Undue Hardship Under the ADA, reprinted in 8 Fair Empl. Prac. Man. (BNA) 405:7627.

[6]"The possibility of working at home or elsewhere should be considered in evaluating whether an employer can reasonably accommodate an individual's need to be away from the workplace. If a qualified individual can perform the essential functions of his/her position from an off-site location without posing an undue hardship on the employer, such accommodation may be reasonable. Such a determination depends on the nature of the job, the individual and the

MCAD Guidelines provide particular guidance, since they "represent the MCAD's interpretation of G. L. c. 151B, and are entitled to substantial deference, even though they do not carry the force of law." *Dahill* v. *Police Dept. of Boston*, 434 Mass. 233, 239 (2001).

We therefore look to the specific facts of this case to determine whether a jury question was presented. We conclude that there was ample evidence from which the jury could find that allowing Smith to do substantial amounts of her work at home (she did not request to work exclusively at home) was a reasonable accommodation.

As previously discussed, the jury reasonably could find that the essential functions of Smith's position were to gather and analyze data, write reports, and make technical recommendations. The jury also could find that it was feasible for Smith to perform most, if not all, of these tasks from a remote location with an adequate computer and telephone access to the company's network; and that on those occasions when Smith had a genuine need to interact personally with others, she was willing and able to travel to the office. There was no intimation that Smith needed close supervision. To the contrary, there was considerable evidence to support the conclusion that she was an unusually responsible employee who could be counted on to be productive without direct oversight. Finally, the company's own practices refuted any suggestion that a work-at-home arrangement would not be effective. There was evidence that the company permitted other second-level managers to do considerable amounts of work at home; and, after consultation among Olson, the disability advocate, and the company's medical staff, the company authorized Smith, herself, to work part-time from home. As noted earlier, the company did not contend that doing so created any undue hardship.

The crux of Smith's case was that, although the company

---

handicap. For example, an employee with chronic back and neck pain who could not endure long daily commutes to work may be able to work from home using a computer modem, fax, and other technologies. However, off-site work may not be a reasonable accommodation where, for example, the position requires personal contact and coordination with coworkers or clients. Also, depending on the nature of the position, it may not be reasonable to permit an employee to work without supervision." (Footnotes omitted.) MCAD Guidelines, *supra* at § X.B.

nominally agreed to a work-from-home arrangement, it did not adequately implement it. Without implying that an employer who undertakes to provide reasonable accommodations inevitably will be exposed to liability if the accommodations are not successful, we think that the company could be found liable in the circumstances presented here. The evidence permitted the jury to find that, notwithstanding the company's considerable expertise in telecommunications, it did not supply Smith with resources (modest from the standpoint of a large enterprise) that would have made the accommodation work. There was evidence that the company failed to provide Smith with an adequate computer, failed to support her use of equipment that she purchased herself and, for several years, failed even to provide her with "plain old telephone service" lines that she could use to connect with the company network. Quite apart from these technical issues, there also was evidence that Smith was hindered in her efforts to work at home by her supervisor's practice of leaving her handwritten instructions at the office, and by the company's inconsistent efforts to include her in meetings by teleconference. To the extent that there was other, contrary evidence, it was for the jury to weigh.

   c. *Sufficiency of causation evidence.* At the heart of Smith's appeal from the partial allowance of the motion for judgment notwithstanding the verdict is the adequacy of the testimony of her treating physician, Dr. Silver. Dr. Silver is a physiatrist, a specialist in the treatment of major injuries involving the musculo-skeletal system, and a leading authority on PPS. Dr. Silver testified that Smith became unable to work and totally disabled because her PPS had progressed to the point where she had difficulty using her arms. In Dr. Silver's opinion, the major contributing factor leading to Smith's total disability was the company's failure to provide accommodations; there were other factors, but lack of workplace accommodation "pushed her over the edge." According to Dr. Silver, lack of workplace accommodations resulted in Smith overusing her extremities, which, in turn, led to the rapid acceleration of her PPS. Because PPS usually does not have a dramatic course, Dr. Silver concluded that, more likely than not, reasonable accommodations would have stabilized Smith's condition and allowed her to continue to pursue full-time work.

On the specific issue of Smith's home office, Dr. Silver opined that if Smith had been given an adequate home office, it would have reduced her physical activity substantially, particularly her need to do transfers. In her view, if Smith had been provided with reasonable accommodations, she would have worked an additional eighteen years, until retirement at age sixty-five; instead, Smith no longer can work and will likely need full-time nursing home placement within ten years. According to Dr. Silver, if Smith had been able to protect her arms, she could have remained independent.

Dr. Silver's opinions were based in large part upon her extensive clinical experience with PPS patients. In addition to treating several hundred PPS patients per year as the Director of the International Rehabilitation Center for Polio, Dr. Silver had conducted studies, including several concerned with preventing further disability. Her opinions also were based upon her familiarity with two specific studies concerning the relationship between PPS and the ability to work: a Swedish study where it was determined that sixty percent of polio survivors had jobs as compared with seventy percent of the general population, and another, unidentified study, which found that accommodation, but not degree of paralysis, was a major factor in determining whether a polio survivor worked. According to Dr. Silver, persons with PPS typically have a normal life expectancy and, although they require accommodation, they generally work until retirement.

While acknowledging Dr. Silver's considerable expertise with respect to PPS, the judge nevertheless found her opinion to be wanting. As an initial matter, the judge discounted Dr. Silver's reliance upon untested personal observation, clinical experience, and unidentified literature, noting that "[t]here was no evidence that Dr. Silver's theory of causation has been subjected to peer review and publication, that the theory has been tested, that the theory has a known error rate, and that the theory has general acceptance in the scientific community." But see *Hicks's Case*, 62 Mass. App. Ct. 755, 760 (2005) (general acceptance, peer review, and publication are not indispensable to admission of medical causation testimony). However, the "major flaw" identified by the judge was Dr. Silver's lack of familiarity with

the details of Smith's day-to-day activities, both personal and professional. We review the judge's ruling under the abuse of discretion standard applicable to evidentiary rulings of this nature. See *Canavan's Case*, 432 Mass. 304, 312 (2000). We conclude that there was no abuse of discretion, if only because Dr. Silver's opinion was lacking in specific factual foundation to support her analysis.

In considering the admissibility of expert testimony, the judge must consider not only the reliability of the scientific principles and methodology underlying the opinion, but also whether "the witness has sufficient knowledge of the particular facts to bring his expertise meaningfully to bear." Liacos, Brodin & Avery, Massachusetts Evidence § 7.7, at 391-392 (7th ed. 1999). Thus, even if Dr. Silver's general assumptions about persons with PPS were adequately supported by her clinical experience and studies of PPS patients, and even if Dr. Silver employed an accepted methodology of "differential diagnosis," see *Hicks's Case*, 62 Mass. App. Ct. at 761, it was necessary for her to take meaningful account of Smith's particular situation.

Dr. Silver's testimony revealed her to have little grasp of the specifics of Smith's life. Although she knew that there were long periods when Smith was on medical leave and did no work at all, she did not know the dates or extent of her absences. She was not familiar with Smith's daily activities during the periods when she was out of work; nor was she aware of the number of hours that Smith spent working. She did not have a specific understanding of Smith's work activities, the details and extent of Smith's surgeries and recoveries, or whether and in what ways the company had provided accommodation.

We agree with the judge that these gaps in Dr. Silver's knowledge about Smith called into question the reliability of her conclusion that it was more probable than not that Smith's worsening PPS was due to the company's failure to accommodate, as opposed to other potential causes. Whether these deficiencies are viewed as a failure of methodology (the flawed use of the differential diagnosis technique) or as a lack of factual foundation, the judge was entitled to exercise her discretion to exclude Dr. Silver's opinion. See *Commonwealth* v. *Lanigan*, 419 Mass. 15, 26 (1994), quoting from *Daubert* v. *Merrell Dow*

*Pharmaceuticals, Inc.,* 509 U.S. 579, 592-593 (1993) (gate-keeper role entails assessing not only validity of expert's reasoning or methodology but also "whether that reasoning or methodology properly can be applied to the facts in issue"); *Fourth Street Pub, Inc.* v. *National Union Fire Ins. Co.,* 28 Mass. App. Ct. 157, 161 (1989) (expert "must have sufficient familiarity with the particular facts to reach a meaningful expert opinion").

Because expert medical testimony was required for Smith to establish a causal connection between the company's failure to accommodate and her inability to work after 1999, see *Canavan's Case,* 432 Mass. at 316, it was proper for the judge to enter judgment notwithstanding the verdict as to Smith's claims for future damages: lost wages, medical expenses, and emotional distress. Smith argues that even if the judge's ruling was otherwise correct, the jury's award for future emotional distress damages must be reinstated because, whether or not the company could be found to have caused her total disability, the distress caused by its failure to accommodate did not end when she stopped working. The problem with Smith's position, however, is that this is not how the issue was submitted to the jury.

The judge charged, without objection, that Smith's claims for future damages, including emotional distress after June, 2000, were based upon the company having rendered her incapable of working. That being the case, the jury's award for future emotional distress cannot reasonably be interpreted as relating to any continuing effects of the company's failure to accommodate while Smith remained employed. Like her other claims of future damages, Smith's claim for future emotional distress fails for lack of causation.[7]

4. *Directed verdict on punitive damages.* After the close of

---

[7]In view of our decision, we need not address the company's alternative argument that Smith's claims for future damages were barred by the Worker's Compensation Act, G. L. c. 152, §§ 24 and 26. But see *Foley* v. *Polaroid Corp.,* 381 Mass. 545, 553 (1980) (violation of an employee's civil rights is not a personal injury compensable under worker's compensation); *College-Town, Division of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination,* 400 Mass. 156, 169 (1987) (emotional distress damages resulting from violation of G. L. c. 151B, § 4, not barred by worker's compensation act);

the plaintiff's case, the judge directed a verdict for the company on Smith's claim for punitive damages, ruling that the evidence did not meet the standard articulated in *Dartt* v. *Browning-Ferris Indus., Inc. (Mass.)*, 427 Mass. 1, 17-17a (1998). The judge heard additional argument on the issue before sending the case to the jury, but did not change her ruling.

We agree that the issue of punitive damages was properly withheld from the jury. Punitive damages under G. L. c. 151B are governed by common-law and constitutional principles. *Id.* at 17a. They may be awarded only for conduct that is "outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Id.*, quoting from Restatement (Second) of Torts § 908(2) (1979). See *id.* at § 908(2) comment d ("[i]t is error . . . for the trier of fact to award punitive damages if there has been no bad motive or wanton indifference"); *Abramian* v. *President & Fellows of Harvard College*, 432 Mass. 107, 119 (2000) (judge's instructions must not allow jury to award punitive damages without finding of "outrageousness").

On the facts presented, there was no basis for finding that the company intentionally or wilfully violated the law or that its conduct was evil in motive. Smith contends, however, that "outrageousness" in the form of "reckless indifference" reasonably could be found based upon the evidence that she repeatedly requested the same accommodations, they were endorsed by the company's doctors, and yet the company, through its supervisors, failed to support her work-at-home arrangement after nominally agreeing to it. Although the evidence was sufficient to demonstrate that Smith's immediate supervisors should have been more attentive to her needs, we agree with the trial judge that no reasonable jury could find that the company's behavior rose to the level of "reckless indifference."

To support an award of punitive damages, there must be more than neglect or even inconsiderate behavior. A high degree of culpability is required. Indeed, to award punitive damages "absent evidence of heightened culpability would very likely constitute an 'arbitrary or irrational deprivation[] of property,'

*Doe* v. *Purity Supreme, Inc.*, 422 Mass. 563, 566-567 (1996) (G. L. c. 151B is a statutory exception to worker's compensation exclusivity).

and thus would be constitutionally impermissible." *Goodrow* v. *Lane Bryant, Inc.*, 432 Mass. 165, 179 (2000), quoting from *TXO Prod. Corp.* v. *Alliance Resources Corp.*, 509 U.S. 443 (1993) (Kennedy, J., concurring).

The evidence, even when viewed in the light most favorable to Smith, showed that the company attempted reasonably to accommodate Smith in several ways. Even if the jury could have found that the company's accommodations fell short in all the ways alleged, the company's behavior, while actionable, was not so egregious as to warrant the condemnation and enhanced deterrence that underlie the imposition of punitive damages. See *Bain* v. *Springfield*, 424 Mass. 758, 767 (1997). Its conduct in this case is adequately redressed by imposing liability for compensatory damages. See *McMillan* v. *Massachusetts Soc. for the Prevention of Cruelty to Animals*, 140 F.3d 288, 306-307 (1st Cir. 1998).

5. *Other issues.* a. *Scope of MCAD charge.* The company argues that the judge erred in allowing the jury to consider events involving Smith's later supervisors when they had not been raised at the MCAD. There was no error.

Smith filed her charge with the MCAD in December, 1995, against the company and Olson. In mid-1998, she filed suit, but the MCAD's investigation continued until November of that year. Olson remained Smith's supervisor until 1996 or 1997, when Roberta Swanson-Hook and later William Haid assumed that role. Smith requested adequate home office accommodation from all of these supervisors, but did not amend her MCAD charge (or file a new charge) specifically mentioning her interactions with Swanson-Hook or Haid. Eventually, Smith dropped her claim against Olson and tried her case only against the company, relying upon events that occurred from 1993 through 1999.

General Laws c. 151B, §§ 5 and 9, require a claimant to file a charge with the MCAD before filing a lawsuit. Doing so puts the employer on notice of the scope of the potential action that can be brought in court and provides the parties with an opportunity to resolve their dispute. See *Carter* v. *Commissioner of Correction*, 43 Mass. App. Ct. 212, 220 (1997). However, the statute does not require a claimant to refile or amend her

complaint with the MCAD as a prerequisite to relying upon later incidents in support of an ongoing violation. See *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 529 n.8 (2001). Such a requirement would not further the purposes of the statute and would only increase the parties' litigation costs and delay final resolution of the claims. *Ibid.*

b. *Excessive damages.* The trial judge rejected the company's posttrial argument that the jury's award of $207,000 for emotional distress suffered by Smith from 1993 to 1999 was excessive. We must uphold her decision, absent an abuse of discretion amounting to an error of law. *Labonte* v. *Hutchins & Wheeler*, 424 Mass. at 824.

When a judge considers whether a verdict is excessive, its size alone is not determinative; the judge must consider "whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption" (citation omitted). *Id.* at 825.

In the context of awards for emotional distress in discrimination cases, the recent case of *Stonehill College* v. *Massachusetts Commn. Against Discrimination*, 441 Mass. 549 (2004), is instructive, even though it arose in the context of awards made by the MCAD. There the court stressed that "emotional distress damages should not be improperly considered, or awarded, as a substitute for punitive damages," and that such damages "should be fair and reasonable, and proportionate to the distress suffered." The court further opined that evidence in the form of physical manifestation or expert testimony may be beneficial, but is not necessary, and that among the factors that should be considered are "the nature and character of the alleged harm, . . . the severity of the harm, . . . the length of time the complainant has suffered and reasonably expects to suffer, and . . . whether the complainant has attempted to mitigate the harm." In addition, the court noted, a complainant must show "a sufficient causal connection between the respondent's unlawful act and the complainant's emotional distress." *Id.* at 575-576.

As the judge observed, there was evidence in the present case

from which the jury could find that Smith's work at the company was her "whole life"; that her repeated, unsuccessful efforts to obtain what she needed to perform her job at home left her feeling frustrated and inadequate; and that, as a result, she suffered from anxiety and diminished self-esteem. We agree that the evidence, including Smith's testimony, correspondence, and the records of the company's medical department, was sufficient to support the conclusion that Smith suffered significant emotional distress as a result of the company's failure to accommodate her with an adequate home office, despite the paucity of supporting expert testimony. Moreover, in contrast to *Labonte* v. *Hutchins & Wheeler*, 424 Mass. at 824, where an emotional distress award of $550,000 was deemed excessive, Smith's distress was not short-lived, but could be found to have continued throughout the final six years of her employment. See *Dalrymple* v. *Winthrop*, 50 Mass. App. Ct. 611, 620-621 (2000) (distinguishing *Labonte* and affirming trial judge's refusal to remit damages for emotional distress).

"A jury, composed, as they are, of persons from varying walks of life and reflecting a variety of experience, make a particularly suitable institution for assessing the emotional damage incident to [a defendant's discriminatory behavior]." *Borne* v. *Haverhill Golf & Country Club, Inc.*, 58 Mass. App. Ct. 306, 320 (2003). The judge did not abuse her discretion in ruling that the jury's award was grounded in the evidence and within the range of just damages.

c. *Attorney's fees and costs.* Both parties challenge the judge's award of attorney's fees and costs to Smith. The judge awarded fees of $246,234 and costs of $34,762, which reflected a reduction by thirty percent of the amount requested by Smith. In making her reductions, the judge subtracted $6,315 in fees and $30.70 in costs for the period prior to the filing of Smith's lawsuit, noting that the MCAD had dismissed the charge in November, 1998, after concluding that there was insufficient information to establish a violation. Of the thirty percent overall reduction, the judge attributed ten percent to the dismissal of Smith's retaliation claim on summary judgment and the jury's rejection of two of the three factual bases for her claim (the company's alleged failure to accommodate by shortening her

commute and by providing her with adequate parking). The remaining twenty percent reduction was attributed to Smith's failure to succeed on her claim for future damages. The judge, however, declined to reduce the award any further, due to the competence of Smith's attorneys and the difficulty of the issue.

"The amount of a reasonable attorney's fee, awarded on the basis of statutory authority, in this case G. L. c. 151B, § 9, is largely discretionary with the judge, who is in the best position to determine how much time was reasonably spent on a case, and the fair value of the attorney's services." *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309, 324 (1993). Under the approved "lodestar" method, the judge is to establish the time reasonably expended and multiply it by a reasonable hourly rate, taking into account factors such as "complexity, the result obtained, and the experience, reputation, and ability of the lawyer." *Borne* v. *Haverhill Golf & Country Club, Inc.*, 58 Mass. App. Ct. at 324.

Smith argues that, because she was required by statute to bring her administrative claim before she could pursue her case in court, she is entitled to the fees and costs she incurred while the case was pending before the MCAD. We think, however, that the judge had discretion to consider the unfavorable MCAD finding in calculating a reasonable fee. Likewise, the judge's reduction for lack of success on some aspects of Smith's claims was well within the permissible bounds of her discretion. See *Wynn & Wynn, P.C.,* v. *Massachusetts Commn. Against Discrimination,* 431 Mass. 655, 676 (2000).

Contrary to the company's position, the judge also acted within her discretion in awarding Smith fees and costs in connection with posttrial matters. That the company's motion for judgment notwithstanding the verdict was partially granted was reflected in the judge's calculations.

d. *Prejudgment interest.* Smith argues that prejudgment interest should have been calculated from the date she filed her MCAD charge.[8] We find no merit in this position.

The parties assume that an award of prejudgment interest in

---

[8] Although she preserved this point below, Smith argued it on appeal only in her reply brief. An argument that is not raised in a party's principal brief may be deemed waived. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921

cases of this nature is governed by G. L. c. 231, § 6H, rather than § 6B. See *Kuppens* v. *Davies*, 38 Mass. App. Ct. 498, 500 & n.6 (1995). Regardless, both sections provide that interest is to be determined "from the date of commencement of the action." These words are to be interpreted literally. See *Gill* v. *North Shore Radiological Assocs.*, 385 Mass. 180, 182 (1982).

The question remains, however, whether "commencement of the action" can be construed to refer to the initial filing of the claim with the MCAD. We agree with the analysis of the First Circuit in *Blockel* v. *J.C. Penney Co.*, 337 F.3d 17, 29-31 (1st Cir. 2003), where, confronted with the identical question — whether prejudgment interest runs from the date of the filing of a complaint under G. L. c. 151B, § 9, or from the filing of the charge with the MCAD — the court held that "commencement of the action" logically refers to initiation of the lawsuit in court and not to the filing of the precourt agency action. See *Thibodeau* v. *Seekonk*, 52 Mass. App. Ct. 69, 72 n.4 (2001), and cases cited. Compare *Franklin Publishing Co.* v. *Massachusetts Commn. Against Discrimination*, 25 Mass. App. Ct. 974, 974-975 (1988) (interest computed from date of original MCAD charge in case heard to conclusion by MCAD). The trial court's computation of prejudgment interest was correct.

6. *Conclusion.* The corrected judgment entered on July 7, 2003, is affirmed. The parties shall bear their own legal fees and costs relating to this appeal.

*So ordered.*

---

(1975); *Fafard* v. *Conservation Commn. of Barnstable*, 432 Mass. 194, 195-196 (2000). Because the briefing was complicated by the existence of cross appeals, we elect to address the issue.