BOSTON PUBLIC HEALTH COMMISSION *vs.* MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION & another.[1]

No. 05-P-939.

Suffolk. May 15, 2006. - September 20, 2006.

Present: BECK, RAPOZA, & CYPHER, JJ.

*Massachusetts Commission Against Discrimination. Anti-Discrimination Law,* Race, Damages. *Employment,* Discrimination. *Administrative Law,* Substantial evidence. *Damages,* Under anti-discrimination law, Back pay, Emotional distress.

Substantial evidence supported the findings of the Massachusetts Commission Against Discrimination that an employer, after terminating a black employee, filled her position with a white person with lesser qualifications [407-408], and that the black employee's termination was motivated not by the reasons asserted by the employer [408-409], but by a discriminatory animus [409-410].

Although the Massachusetts Commission Against Discrimination (commission) acted within its discretion in awarding six years of back pay damages to a prevailing employee in a discrimination action [410], the evidence did not justify the amount awarded by the commission as emotional distress damages, and this court remanded the case to the Superior Court for a redetermination of that award [410-413].

CIVIL ACTION commenced in the Superior Court Department on June 21, 2004.

The case was heard by *Jeffrey A. Locke,* J., on a motion for judgment on the pleadings.

*Fatema Fazendeiro* for the plaintiff.

*Frank J. Teague* for Marilyn Lewis.

*William F. Green* for Massachusetts Commission Against Discrimination.

BECK, J. Marilyn Lewis, a black woman with training in accounting and business administration, was terminated from her

---

[1]Marilyn Lewis.

job as assistant fiscal director of the Trustees of Health and Hospitals of the City of Boston (TH&H) with one day's notice. The alleged reasons for her discharge were corporate restructuring and an impending merger. A Superior Court judge affirmed a final administrative decision of the Massachusetts Commission Against Discrimination (MCAD), ruling that the termination was the product of unlawful racial discrimination in violation of G. L. c. 151B, § 4. The MCAD award to Lewis included $107,551 for back pay and $100,000 for emotional distress.[2] The Boston Public Health Commission (BPHC), successor in interest to TH&H, appeals.

*Factual background.* Before her employment at TH&H, Lewis had worked for two years as a staff accountant and a senior accountant at the large accounting firm of KPMG Peat Marwick LLP, and for more than two years as a supervisor and audit manager for the public accounting firm of DePisa & Co. She passed the certified public accountant (CPA) examination, completed her experience requirements, and was certified as a CPA by the Massachusetts Board of Public Accountancy in 1991. She also had a degree in business administration and accounting from Suffolk University.

In September, 1993, TH&H hired Lewis as its grants administration manager. Her duties included overseeing the financial and accounting components of more than eighty grants, and supervising six accountants. She also maintained the general ledger and payroll accounts, and developed policies for grant accountants to meet funding deadlines. Lewis received a favorable performance evaluation from her supervisor after working at TH&H for four months. She received a merit-based annual salary increase of $2,180 after six months.

On February 22, 1995, Lewis was promoted to the position of assistant fiscal director at TH&H. Her new responsibilities included generating monthly financial reports, maintaining the general ledger, and overseeing accounts payable and receivable and monthly budget reports. Lewis worked up to eighty hours each week and sometimes on holidays.

In April, 1995, TH&H hired Joseph Brown as its fiscal

---

[2]Lewis also was awarded damages for increased health insurance costs and attorney's fees; neither award is raised on appeal.

director. Although Brown was Lewis's immediate supervisor, he did not give her performance evaluations. Indeed, he had no real contact with her after their initial meeting. A few months after TH&H hired Brown, Lewis's free parking space was revoked.

On January 23, 1996, Brown summoned Lewis to his office and handed her a letter terminating her employment at the close of the next business day. The termination took place in front of the director of human resources at TH&H. The letter explained Lewis's termination as a programmatic restructuring of the corporate accounting department that involved the elimination of her position. Brown subsequently admitted that the restructuring had been his idea. Lewis did not receive any written evidence of the restructuring. TH&H also suggested that the impending merger between Boston City Hospital and University Hospital necessitated the termination of Lewis's position. Lewis was the only senior manager who lost her job because of the alleged restructuring.

Michael Gaudreau, a white employee, was terminated at the same time as Lewis. Lewis supervised Gaudreau and performed all of his duties when he was absent. However, Gaudreau did not perform any of Lewis's duties in her absence. He was not a CPA, did not have a master's degree in business administration (MBA), and did not have prior experience at a public accounting firm.

Eight days after Lewis's termination, TH&H posted an internal job notice for the position of controller in the corporate accounting department. Lewis was not notified of the new position, even after the posting expired and Brown contacted a placement agency to solicit applicants. The duties of the controller generally were a consolidation of Lewis's former duties and Gaudreau's former duties.[3] Lewis had performed all of the listed duties satisfactorily during her employment at TH&H.

In May, 1996, Brown hired Lawrence Burke, a white male,

_____

[3]As the assistant fiscal director, Lewis's duties included managing and auditing the general ledger; coordinating monthly financial reports, including accounts receivable and payable; creating grant set-up approvals; budget management; and performing Gaudreau's duties when he was absent. Gaudreau's duties entailed supervising the payroll and working with the general

for the position of controller. Brown had weekly one-hour meetings with Burke. Burke had an MBA, but was not a CPA. Although he had worked as a controller of a private corporation for ten years, he had no experience working in the public sector, no experience in grants administration, and no knowledge of the software system used by TH&H for its grants administration accounting. Burke maintained his position after the merger and became an employee of the Boston Medical Center.

Following her termination, Lewis was unemployed for two months. She then worked as a contractor for one of her former employers for six months while discussing her future employment options with professionals in the field. Lewis ultimately decided to start her own accounting business, in large part because her sudden termination caused her to fear working for another organization.

Lewis testified that she was shocked by her unexpected and immediate termination. She was "devastat[ed], embarrass[ed]," and distressed as a result of Brown's actions.

*Racial discrimination.* Lewis's racial discrimination claim is based on alleged violations of G. L. c. 151B, § 4, as amended by St. 1989, c. 516, § 4, which, in relevant part, makes it unlawful "[f]or an employer, by himself or his agent, because of the race . . . of any individual to . . . discharge from employment such individual . . . unless based upon a bona fide occupational qualification." Specifically, Lewis asserts that BPHC discriminated against her by discharging her from her position as assistant fiscal director because of her race.

Claims of racial discrimination based on a disparate treatment theory under G. L. c. 151B are evaluated under a familiar three-stage order of proof when a plaintiff uses indirect evidence to prove unlawful discrimination. *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 440-446 (1995). In the first stage, a plaintiff must prove the four elements of a prima facie case of race discrimination: (1) membership in a protected group; (2) performance of her job at a satisfactory level;

---

ledger, with a focus on indirect cost proposals.

The controller's listed duties consisted of managing and supervising corporate and general accounting functions, supervising the general ledger, supervising payroll, preparing indirect cost proposals, and preparing audit schedules.

(3) termination from employment; and (4) either the employer's continued efforts to fill the position or the employer's hiring of a member of an unprotected group with the same or lesser qualifications than the plaintiff. *Id.* at 441. BPHC challenges the MCAD's finding regarding the fourth element, namely, that TH&H filled Lewis's position by hiring Burke.

"We will affirm a decision and order of the MCAD unless the findings and conclusions are unsupported by substantial evidence or based on an error of law." *Salem* v. *Massachusetts Commn. Against Discrimination,* 44 Mass. App. Ct. 627, 640-641 (1998) (footnote omitted). We conclude that the MCAD's determination that Lewis satisfied her prima facie case met the required standard. The record indicates that Lewis was qualified to perform all of the duties listed in the job posting for the position of controller. Several of the responsibilities for controller were identical to those Lewis performed as assistant fiscal director. Other responsibilities were those of Gaudreau. Lewis, however, was Gaudreau's supervisor, and performed these tasks in his absence. Lewis therefore was qualified to perform the controller's duties. Thus, the record supports the MCAD's finding that the controller position was essentially the same position as Lewis's position.

The record also shows that Lewis was replaced by a white person with lesser qualifications. Although Burke had ten years of employment experience as a controller in a private company, he had no experience in the public sector, was not a CPA, and was unfamiliar with the software used by TH&H. Burke's experience as a controller in other organizations was not significant because there were no responsibilities for controller beyond those that Lewis had proved capable of performing. Nor did Burke have experience with grant administration, which was one of the listed duties for the controller position.

BPHC also argues that there was insufficient evidence to support a finding of pretext at the third stage of the order of proof. BPHC asserted two reasons for terminating Lewis's employment: a restructuring of the corporate accounting department and the impending merger. Lewis provided sufficient evidence to support a finding that these reasons were not the real reasons for terminating her employment. TH&H posted a job listing for

controller, a job that was essentially the same position as Lewis's, eight days after Lewis's termination. The alleged reorganization did not result in the termination of any other senior manager. Moreover, the controller position survived the merger of the hospitals.

Other indirect evidence also supports the finding of discriminatory animus. While Brown met weekly with Burke, he never met with, reviewed, supervised, or evaluated Lewis. Brown never provided documentation of any reorganization that required the elimination of Lewis's position. Burke was a white male who was less qualified than Lewis for the controller position, but TH&H never contacted Lewis about applying for the position. Even though Burke's position was essentially the same as the one Lewis previously had held, the position was not eliminated by the reorganization.

BPHC relies heavily on *Weber* v. *Community Teamwork, Inc.*, 434 Mass. 761, 778 (2001), for the proposition that Lewis did not meet her burden of proving discriminatory animus. *Weber*, however, is distinguishable. The Supreme Judicial Court remanded in *Weber* because the trial judge did not make specific findings regarding whether the plaintiff had proved discriminatory animus and causation (two of the required elements for any claim of unlawful discrimination). *Id.* at 775-776.

Here, in contrast, the MCAD made findings that Lewis had proved discriminatory animus through indirect evidence and found that the animus caused her termination. While there were no findings in *Weber* distinguishing the plaintiff's termination from the contemporaneous termination of a male employee, here the MCAD made detailed findings explaining why Gaudreau's termination was distinguishable from Lewis's.[4] See *id.* at 778. Furthermore, the record in *Weber* contained testimony citing specific examples of the plaintiff's inadequate work performance, which provided an evidentiary basis for the employer's articulated reason for firing her. *Id.* at 773-774. In

---

[4] There was substantial evidence supporting the MCAD's finding that Burke, not Gaudreau, was the proper comparator because Burke's duties were the same as Lewis's while Gaudreau's duties and qualifications were significantly inferior. See generally *Matthews* v. *Ocean Spray Cranberries, Inc.*, 426 Mass. 122, 129-130 (1997). Thus, Gaudreau's race and termination were irrelevant to the analysis.

contrast, there is nothing in the record before us supporting either of BPHC's reasons for Lewis's termination.

Because the record reveals sufficient evidence that Lewis's termination reflected TH&H's discriminatory animus, the MCAD did not err in deciding that Lewis was entitled to recover for illegal discrimination under G. L. c. 151B. See *Blare* v. *Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. at 444-445; *Lipchitz* v. *Raytheon Co.,* 434 Mass. 493, 504 (2001).

*Back pay award.* BPHC further argues that the award of $107,551 in back pay damages to Lewis was unsupported by substantial evidence and not in accordance with law because an award of back pay for six years was excessive. Back pay is calculated from the date of termination until the date of the MCAD hearing, see *Beaupre* v. *Cliff Smith & Assocs.,* 50 Mass. App. Ct. 480, 496-497 & n.25 (2000), subject to the plaintiff's duty to mitigate, see *Conway* v. *Electro Switch Corp.,* 402 Mass. 385, 388-389 (1988). It was well within the MCAD's discretion to award back pay damages to Lewis, calculated from the date of her termination to the date of the MCAD hearing. See *id.* at 387-388. It was not error to conclude that Lewis's self-employment satisfied her duty to mitigate damages. The record revealed that Lewis was hesitant to work for any employer after being fired in a sudden and discriminatory manner and that she began her own business in good faith. See *Brooks* v. *Woodline Motor Freight, Inc.,* 852 F.2d 1061, 1065 (8th Cir. 1988); *Smith* v. *Great Am. Restaurants, Inc.,* 969 F.2d 430, 438 (7th Cir. 1992); *Hawkins* v. *1115 Legal Serv. Care,* 163 F.3d 684, 696 (2d Cir. 1998). See also *National Labor Relations Bd.* v. *Cashman Auto Co.,* 223 F.2d 832, 836 (1st Cir. 1955).

*Emotional distress damages.* BPHC also challenges the MCAD award of $100,000 in damages for emotional distress. "Emotional distress damage awards, when made, should be fair and reasonable, and proportionate to the distress suffered." *Stonehill College* v. *Massachusetts Commn. Against Discrimination,* 441 Mass. 549, 576 (2004). A finding of discrimination, by itself, is insufficient as a matter of law to infer emotional distress. See *ibid.*; *DeRoche* v. *Massachusetts Commn. Against Discrimination,* 447 Mass. 1, 7 (2006). To be compensable, emotional distress must be proved by substantial evidence of a

causal connection between the plaintiff's emotional distress and the employer's unlawful act. *Stonehill College, supra.*

Evidence of a physical manifestation of the emotional distress, or expert testimony, is useful but not essential to support an award of emotional distress damages. *Ibid.* In determining an award, "[s]ome factors that should be considered include (1) the nature and character of the alleged harm; (2) the severity of the harm; (3) the length of time the [plaintiff] has suffered and reasonably expects to suffer; and (4) whether the [plaintiff] has attempted to mitigate the harm." *Ibid.* Applying these factors, we hold that there was evidence in the record to support the MCAD determination that damages for emotional distress were warranted. However, we conclude that the facts in this case do not justify the $100,000 awarded. We therefore remand to the Superior Court for further findings and rulings consistent with this opinion. See *ibid.*

Three recent Massachusetts appellate decisions since *Stonehill College* guide our determination of the reasonableness of the emotional distress award in this case. In the first case, *Smith v. Bell Atl.,* 63 Mass. App. Ct. 702, 710 (2005), we affirmed the portion of the jury award, in the amount of $207,000, for emotional distress suffered during the plaintiff's employment. *Ibid.* The record reflected that the plaintiff considered her work as her "whole life"; that she felt "frustrated and inadequate" for the last six years of her employment because of "her repeated, unsuccessful efforts to obtain what she needed [as a handicapped person] to perform her job at home"; and that "she suffered from anxiety and diminished self-esteem." *Id.* at 724. Moreover, although she did not present expert testimony, she supported her testimony with correspondence and records from the employer's medical department. *Ibid.*

The second case is *School Comm. of Norton* v. *Massachusetts Commn. Against Discrimination,* 63 Mass. App. Ct. 839 (2005). In that case, we affirmed an MCAD emotional distress award in the amount of $50,000 where the plaintiff presented evidence that she "loved her job," that the firing was "devastating and humiliating," and that her firing caused her to "suffer from panic attacks and lose her appetite, her hair, and twenty percent of her body weight" (i.e., she lost twenty pounds). *Id.* at 849.

The plaintiff also saw a psychologist until her medical insurance benefits ran out. *Ibid.*

The final case is the recent Supreme Judicial Court decision in *DeRoche* v. *Massachusetts Commn. Against Discrimination,* 447 Mass. 1. In that case, the plaintiff retired at age sixty-five because he believed that his employer's mandatory retirement age was sixty-five years old. *Id.* at 4. Approximately two years later, he was notified that the actual age of mandatory retirement earlier had been increased to seventy. *Ibid.* After filing a complaint for unlawful age discrimination, he regained employment with the employer, but was reassigned after one day to a position that was more dangerous and physically demanding than his prior position. *Id.* at 4-5. He then amended his complaint to include a claim for retaliation, and the MCAD found that his reassignment constituted unlawful retaliation. *Id.* at 5. When testifying about his emotional distress, DeRoche described his work as "his whole life." *Id.* at 7-8. His wife testified that he " 'dreaded' the approach of his sixty-fifth birthday and was 'shattered' that he had to give up his job"; his daughter described him as "despondent," "devastated," and "very depressed" in the days leading to retirement, and "broken-hearted" when he found that he never was told that the mandatory retirement age was seventy and not sixty-five. *Id.* at 8. When asked about the employer's retaliatory behavior, DeRoche testified that he "couldn't understand the line of reasoning" for being reassigned to a more dangerous and physically demanding position. *Ibid.*

Although the court affirmed the finding of unlawful retaliation, it struck the $50,000 award for emotional distress because the evidence did not support the MCAD determination that the plaintiff's emotional injuries were causally connected to the finding of retaliation against the employer. *Id.* at 8-9. The court reasoned that the evidence presented related to the plaintiff's distressed emotional state in the months preceding his retirement and in reaction to being informed of the mistaken timing of his retirement, but was not connected to his reassignment to a more dangerous position, i.e., the retaliatory action. *Id.* at 9. His testimony that he "couldn't understand" his reassignment was insufficient to justify an award for emotional distress. *Ibid.*

Moreover, the court noted that the plaintiff testified that he never sought medical treatment for symptoms related to emotional distress and he did not experience any physical manifestations of distress. *Id.* at 8-9.

Here, the record reveals that Lewis was entitled to an award of damages for emotional distress. There was substantial evidence that she suffered emotional injuries, causally connected to the finding of unlawful discrimination. Brown called her into his office and gave her one day's notice of her termination. Lewis testified that she was devastated, as well as embarrassed because she had to pack up her belongings in front of her coworkers. After learning that her position had been reposted only eight days after her termination, she was shocked, and her termination caused instability at home with her husband and her children. She further testified that her firing caused her to question her ability to work for another employer. Unlike in *DeRoche*, Lewis's testimony causally connected her emotional distress to TH&H's unlawful discrimination.

However, using *Smith* and *School Comm. of Norton* as guideposts for emotional distress awards, we conclude that there was not substantial evidence in the record to justify a $100,000 award. Unlike in *Smith*, where the plaintiff suffered from anxiety and decreased self-esteem for six years, Lewis did not testify to the length of time she suffered from the embarrassment of packing her belongings in front of her coworkers and of learning of her job's reposting eight days after the termination, or the length of time she experienced instability at home. While the *Smith* plaintiff corroborated her testimony with correspondence and medical records, Lewis has not corroborated her testimony of emotional distress. Finally, unlike *School Comm. of Norton*, Lewis did not seek any counseling or mental health treatment and did not suffer from any physical manifestations of her emotional distress.

So much of the judgment as awarded $100,000 for emotional distress is vacated and the case is remanded to the Superior Court for determination of an emotional distress award consistent with this opinion. The remainder of the judgment is affirmed.

*So ordered.*