## SCHOOL COMMITTEE OF NORTON *vs.* MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION & another.[1]

No. 04-P-188.

Bristol. March 4, 2005. - July 12, 2005.

Present: LENK, KAFKER, & KATZMANN, JJ.

*Massachusetts Commission Against Discrimination. Administrative Law,* Substantial evidence, Findings. *Handicapped Persons. Anti-Discrimination Law,* Handicap, Damages, Employment, Termination of employment, Attorney's fees. *Damages,* Emotional distress, Under anti-discrimination law, Back pay, Attorney's fees.

In a civil action for employment discrimination based on handicap in violation of G. L. c. 151B, § 4(16), a Superior Court judge properly upheld the decision of the Massachusetts Commission Against Discrimination (MCAD) that a cafeteria worker who was terminated from her employment because of a permanent medical restriction precluding her from lifting in excess of twenty-five pounds, was a qualified handicapped person capable of performing the essential functions of her job with reasonable accommodation, and that her employer, a town school committee, discriminated against her by not engaging her in dialogue regarding accommodations, not adquately investigating reasonable accommodations, and failing to demonstrate that such accommodation would be burdensome [843-848]; further, the MCAD was within its discretion to award the employee emotional distress damages [848-849] and to decline to offset any unemployment benefits she received against her back pay award [849-850].

In an employment discrimination action, the Massachusetts Commission Against Discrimination was well within its discretion in using the "lodestar method" to determine the employee's attorney's reasonable hourly billing rates for purposes of calculating an award of attorney's fees, and in not reducing the lodestar, given that the attorney provided substantial, uncontested evidence of the market value of his services. [850-854]

CIVIL ACTION commenced in the Superior Court Department on March 20, 2003.

A decision of the Massachusetts Commission Against Discrimination was affirmed with the exception of the award of

---

[1]Mary-Ann Woodason.

attorney's fees by *Richard T. Moses,* J., and a motion for judgment on the pleadings was heard by *John P. Connor, Jr.,* J.

*Maureen A. Lee* for the plaintiff.

*John F. Tocci* for Mary-Ann Woodason.

*Steven Locke* for Massachusetts Commission Against Discrimination.

KAFKER, J. The issues presented in this case are whether the Massachusetts Commission Against Discrimination (MCAD or commission) correctly determined that Mary-Ann Woodason, a cafeteria worker terminated from her employment by the school committee of Norton (school committee) because of a permanent medical restriction precluding her from lifting in excess of twenty-five pounds, was (1) a qualified handicapped person capable of performing the essential functions of her job with reasonable accommodation and if so, whether she was (2) entitled to emotional distress damages, lost pension benefits, a back pay award without an offset for unemployment compensation, and attorney's fees. A Superior Court judge affirmed the decision of the MCAD with the exception of the award of attorney's fees, which he concluded were limited as a matter of law to the billing rate the attorney charged at the commencement of the representation, before he joined a large Boston firm. We conclude that the MCAD did not abuse its discretion in awarding attorney's fees based on the lodestar method, which calculates the fees using a reasonable market rate, and the judgment shall be so modified. We otherwise affirm the judgment of the Superior Court upholding the MCAD decision.

1. *Background.* The defendant, Mary-Ann Woodason, began working for the school committee as a cafeteria assistant on March 20, 1989. Woodason had served seven years at the L.G. Nourse Elementary School when, in the spring of 1997, she injured her back and underwent surgery to repair a ruptured disc. On August 19, 1997, she informed the cafeteria director, Irene Stanovich, of the operation and her inability to return to work until she had fully recuperated. They agreed that Woodason would use her accrued sick time until she was ready to return to work. After meeting with her doctor, Woodason called Stanovich on October 22, 1997, to report her progress and informed Stanovich that, due to her condition, she would not be

able to lift objects weighing more than twenty-five pounds. Stanovich did not indicate at this time that the restriction would be a problem. On November 19, 1997, Woodason met with her doctor, who cleared her to return to work on December 1, 1997, with a medical restriction prohibiting her from lifting more than twenty-five pounds. Woodason relayed this information to Stanovich on the same day and requested an accommodation. During this conversation, Stanovich told Woodason that she could not return to work with the lifting restriction. Through her counsel's letter dated January 12, 1998, Woodason requested that she be allowed to return to work with an accommodation, which she described as having another employee lift a thirty-one pound milk crate into a milk dispenser, a task that she said was required once a day. On January 28, 1998, the school committee informed Woodason by letter that her employment would be terminated on February 6, 1998 (when her sick leave expired), if she still were subject to the lifting restriction. The school committee wrote that in order to accommodate her lifting restriction, it would have to hire an additional cafeteria assistant, which would "impose an undue hardship to its business of operating the schools," as Woodason's duties as a cafeteria assistant "require her to consistently lift objects heavier than twenty-five pounds." Woodason was still subject to the restriction on the assigned date, and the school committee subsequently terminated her employment.

On February 20, 1998, Woodason filed a complaint against the school committee with the MCAD alleging that the school committee had discriminated against her because of her handicap in violation of G. L. c. 151B, § 4(16). She further alleged that Maurice Splaine, the superintendent of schools, and Stanovich aided and abetted the school committee's discriminatory acts.

An MCAD hearing officer held a public hearing over the course of three days in February, 2001, and issued her decision in favor of Woodason on January 31, 2002. First, the hearing officer found, based on undisputed testimony and medical records, that Woodason had a chronic back injury that resulted in a "permanent medical restriction prohibiting her from lifting more than twenty-five pounds. This was a permanent restriction

applicable to every aspect of her life. As a result of this restriction, Complainant is unable to perform a number of routine tasks in her life. She is unable to do yard work and gardening or shovel snow. She can no longer lift and carry her grandchildren and cannot carry filled grocery bags. She and her husband moved from their home to a condominium because of her inability to continue performing many of these routine household tasks."

Second, the hearing officer concluded that Woodason was a "qualified handicapped person" under G. L. c. 151B, § 1(16), because she was "capable of performing the essential functions of her position with a reasonable accommodation on those occasions when an accommodation was necessary." The hearing officer found that only a few of Woodason's duties required her to lift more than twenty-five pounds, and Woodason could have been accommodated by breaking each of those tasks down into lighter tasks, making additional trips, using a wheeled cart, or relying on help from other employees. None of these accommodations, the hearing officer concluded, would have imposed an undue financial or administrative hardship on the cafeteria operations.

Third, the hearing officer found that the school committee, Splaine, and Stanovich failed to engage in a dialogue with Woodason regarding possible accommodations and did not attempt to ascertain whether possible accommodations were an option. Fourth, the hearing officer ordered the school committee[2] to pay Woodason emotional distress damages of $50,000, back pay for eighteen weeks totaling $4,595.40, and lost pension benefits of $28,970.32. Finally, the hearing officer instructed the school committee to conduct training sessions on the accommodation of disabled employees.

The full commission of the MCAD affirmed the hearing officer's decision[3] and awarded Woodason attorney's fees in the

[2]The hearing officer dismissed the claims against Stanovich and Splaine. They were not parties to the review by the Superior Court and are not parties to this appeal.

[3]The commission concluded that there were "no material errors of fact or law" and that there was "substantial evidence in the record to support the findings of fact made by the [h]earing [o]fficer."

amount of $74,760.80. The school committee appealed the commission's decision to the Superior Court pursuant to G. L. c. 151B, § 6, which provides for a review in accordance with the standards set out in G. L. c. 30A, § 14(7). The Superior Court judge affirmed the commission's decision except with respect to the attorney's fees. All parties appealed.

2. *Discussion.* a. *Standard of review.* Based on statutory law, "[w]e will affirm a decision and order of the MCAD unless the findings and conclusions are unsupported by substantial evidence or based on an error of law." *Salem* v. *Massachusetts Commn. Against Discrimination*, 44 Mass. App. Ct. 627, 640-641 (1998). See G. L. c. 151B, § 6; G. L. c. 30A, § 14(7). "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion,' taking 'into account whatever in the record detracts from its weight.' " *Lycurgus* v. *Director of Div. of Employment Security*, 391 Mass. 623, 627-628 (1984). See G. L. c. 30A, § 1(6). We also give deference to the MCAD's findings where the evidence is conflicting, given the agency's "experience, technical competence, and specialized knowledge . . . , as well as the discretionary authority conferred on it." G. L. c. 30A, § 14(7). See *Smith College* v. *Massachusetts Commn. Against Discrimination*, 376 Mass. 221, 224 (1978); *Ramsdell* v. *Western Mass. Bus Lines, Inc., supra* at 676. However, "[a] court will overturn the commission's findings only if the court concludes, as matter of law, that the commission's reliance on evidence was unreasonable." *School Comm. of Brockton* v. *Massachusetts Commn. Against Discrimination*, 423 Mass. 7, 15 (1996).

b. *Handicap discrimination.* As provided by G. L. c. 151B, § 4(16), as inserted by St. 1983, c. 533, § 6, it is unlawful "[f]or any employer, personally or through an agent, to dismiss from employment . . . because of [her] handicap, any person alleging to be a qualified handicapped person, capable of performing the essential functions of the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business."

We begin with the threshold question whether Woodason was

a handicapped person. As defined by G. L. c. 151B, a "handicap" means "(a) a physical or mental impairment which substantially limits one or more major life activities of a person; (b) a record of having such impairment; or (c) being regarded as having such impairment." G. L. c. 151B, § 1(17).[4] See generally *Dahill* v. *Police Dept. of Boston*, 434 Mass. 233 (2001); *Ocean Spray Cranberries, Inc.* v. *Massachusetts Commn. Against Discrimination*, 441 Mass. 632 (2004); *Dube* v. *Middlesex Corp.*, 59 Mass. App. Ct. 734 (2003). As further interpreted by the MCAD, the term "major life activities" includes "lifting." MCAD Guidelines: Employment Discrimination on the Basis of Handicap Chapter 151B, § II.A.5 (1998) (MCAD Guidelines). See generally *Dahill* v. *Police Dept. of Boston, supra* at 239 ("guidelines represent the MCAD's interpretation of G. L. c. 151B, and are entitled to substantial deference"). The guidelines provide no more specific guidance regarding the inability to lift as a handicap. They do state generally, however, that the "determination of whether an impairment substantially limits a major life activity depends on the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long-term impact of the impairment." MCAD Guidelines § II.A.6. The Supreme Judicial Court has also emphasized that "[G. L.] c. 151B anticipates that determining whether a person is a 'handicapped person' will be an individualized inquiry. . . . [P]er se rules are to be avoided." *Ocean Spray Cranberries, Inc.* v. *Massachusetts Commn. Against Discrimination, supra* at 637.

The school committee initially stated in a joint certification memorandum submitted to the MCAD and dated October 17, 2000, that there was "no dispute that Mary Ann Woodason is a 'handicapped person' as that term is defined by M.G.L. c. 151B, § 4(16)." See generally *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 447 (2002) (issue of handicap apparently not contested where the medical restriction for an admitting assistant at a hospital prescribed "no repetitive lifting or intermittent lifting" above fifteen pounds, as well as no repetitive tasks

---

[4]"The statute draws a distinction between persons who have a physical or mental impairment, and those whose impairment 'substantially limits' a 'major life' activity." *Dahill* v. *Police Dept. of Boston*, 434 Mass. 233, 237 (2001).

such as keyboarding or writing). In the certification order dated November 10, 2000, the investigating commissioner referenced the joint certification memorandum, but nevertheless included the handicap issue for the public hearing following a conference with the parties.[5] During the hearing, the school committee did not contest any of the evidence regarding Woodason's handicapped status; rather, it sought to prove that the twenty-five pound lifting restriction meant that she could not perform the essential functions of the job or be reasonably accommodated. In its petition for full commission review, the school committee did not object to the finding that Woodason was handicapped. The issue was apparently raised for the first time only in the school committee's "Supplemental Memorandum to Petition for Review." The Superior Court judge ruled that the school committee was precluded from pursuing the handicap issue because it had not been raised in the MCAD hearings. The judge relied on the provision of G. L. c. 151B, § 6, as inserted by St. 1946, c. 368, § 4, that states "[n]o objection that has not been urged before the commission shall be considered by the court."

We conclude that the undisputed evidence on this essentially uncontested issue supports the commission's findings that Woodason had a physician-imposed, permanent lifting restriction of twenty-five pounds arising out of chronic back problems, including a ruptured disk in her back. As lifting is specifically defined by the MCAD Guidelines as a major life activity, and it was substantially and permanently limited here, along with other important life activities, we conclude that there was sufficient evidence to support the MCAD's conclusion that Woodason was a handicapped person as defined by G. L. c. 151B, § 1(17).[6] We also conclude that the school committee submitted too little too late to the MCAD on the handicap issue to satisfy

---

[5] The school committee claims in its brief that it changed its position with respect to Woodason's status as a handicapped person at the certification conference.

[6] Where the issue is actively contested, further refinement in the MCAD's analysis would be most beneficial. As noted above, the MCAD Guidelines on lifting restrictions as a handicap are very general. Also, although Massachusetts has distinguished Federal precedent in defining "handicap" in another context, see *Dahill* v. *Police Dept. of Boston*, 434 Mass. at 242-243, the issue of lifting restrictions has generated some uncertainty and raised some difficult questions under Federal case law interpreting analogous Federal statutes, particularly

the requirements of G. L. c. 151B, § 6, which are prerequisites to raising the issue in Superior Court.

We next consider whether Woodason was a "qualified handicapped person," i.e., a "handicapped person who would be capable of performing the essential functions of a particular job with reasonable accommodation to [her] handicap." G. L. c. 151B, § 1(16). "Essential functions" are "those functions which must necessarily be performed by an employee in order to accomplish the principal objectives of the job." MCAD Guidelines § II.B. However, a reasonable accommodation may include "modifying when and how an essential job function is performed." *Id.* at § II.C.3. The school committee argues that some of the essential functions of a cafeteria assistant — lifting dish trays, cleaning serving stations, and filling a coffee urn — required lifting of more than twenty-five pounds. The hearing officer credited testimony from Woodason and several of her former coworkers that she could perform all these functions

when the major life activity at issue is working. See *Toyota Motor Mfg., Kentucky, Inc.* v. *Williams,* 534 U.S. 184, 193 (2002) (where Supreme Court expressly stated that it was not addressing whether lifting restrictions that prevented the claimant from gardening, housework, and playing with her children rendered her disabled under Federal law). Compare *Lowe* v. *Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1174 (10th Cir. 1996) (sufficient evidence existed for plaintiff suffering from multiple sclerosis who had a fifteen pound lifting restriction to withstand summary judgment), and *Burns* v. *Coca-Cola Enterprises, Inc.,* 222 F.3d 247, 254 (6th Cir. 2000) (twenty-three pound lifting restriction substantially limited major life activity of working based on individual determination, which considered plaintiff's education and prior work experience), with *Aucutt* v. *Six Flags Over Mid-America, Inc.,* 85 F.3d 1311, 1319 (8th Cir. 1996) (twenty-five pound lifting restriction, without more, does not amount to a significant restriction on ability to perform major life activities); *Williams* v. *Channel Master Satellite Sys., Inc.,* 101 F.3d 346, 349 (4th Cir. 1996) ("as a matter of law, . . . a twenty-five pound lifting limitation — particularly when compared to an average person's abilities — does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity"); *Duncan* v. *Washington Metropolitan Area Transit Authy.,* 240 F.3d 1110, 1115-1116 (D.C. Cir. 2001) (back injury preventing plaintiff from lifting more than twenty pounds does not substantially limit major life activity of working), and *Mays* v. *Principi,* 301 F.3d 866, 869 (7th Cir. 2002) (Judge Posner, in dicta, expressing doubt whether lifting more than ten pounds substantially limits a person in major life activities). See also *Gillen* v. *Fallon Ambulance Serv., Inc.,* 283 F.3d 11, 22-23 (1st. Cir. 2002) (discussing lifting restriction in the context of a claimant with a missing hand).

with simple modifications, such as sharing chores with coworkers, using a cart to move some objects, and lightening the load in carrying other objects from one place to another. With these reasonable accommodations, she concluded, Woodason's duties could be accomplished within the allotted time and without additional personnel or disruption of the cafeteria's schedule.

The school committee points out the conflicting testimony as to whether Woodason could perform the essential functions of her job on time with the practical modifications. It further argues that the hearing officer's reliance on Woodason and her witnesses was unreasonable. Under the substantial evidence test, however, "[c]redibility is an issue for the commissioner and not for this court." *Ramsdell* v. *Western Mass. Bus Lines, Inc.*, 415 Mass. at 676. It was not unreasonable for the hearing officer to credit Woodason and her witnesses, particularly given inconclusive and inconsistent testimony from the school committee's witnesses regarding the frequency with which Woodason performed certain tasks and her ability to work with the lifting restriction. We therefore conclude that the MCAD's decision that Woodason was a qualified handicapped person finds substantial support in the evidence.

Third, the school committee disputes the hearing officer's findings that it discriminated against Woodason on the basis of handicap by (1) not engaging her in dialogue regarding accommodations, (2) not adequately investigating reasonable accommodations, and (3) failing to demonstrate that such accommodation would be burdensome. The school committee incorrectly asserts that it was not obligated to engage Woodason in dialogue regarding accommodations: "[I]t is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one." *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. at 457, quoting from *Taylor* v. *Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir.), cert. denied, 519 U.S. 1029 (1996). *Ocean Spray Cranberries, Inc.* v. *Massachusetts Commn. Against Discrimination*, 441 Mass. at 644. See MCAD Guidelines § II.C ("If a person with a handicap requests but cannot suggest an appropriate accommodation, the employer and the individual should work together to identify one"). Not

only was there substantial evidence that the school committee did not engage in a dialogue with Woodason, the record shows that neither Splaine nor Stanovich consulted with other cafeteria workers about their respective duties or considered or investigated alternative accommodations. "The refusal of an employer to participate in [the] process . . . is a violation of our discrimination laws." *Ocean Spray Cranberries, Inc.* v. *Massachusetts Commn. Against Discrimination*, supra at 644. There was no error of law.

The school committee also asserts the affirmative defense that Woodason's accommodations imposed an undue hardship to its business. According to the testimony of Splaine and Stanovich, the only way to accommodate Woodason was to hire another full-time employee, which would have been too expensive. To the contrary, the hearing officer found that such a measure would not be necessary based on other employees' testimony that the cafeteria was a cooperative working environment where they assisted each other with various responsibilities and swapped duties depending on their proclivities for certain types of work. These circumstances allowed the hearing officer to conclude that Woodason could be accommodated with the previously described "practical modifications" without imposing an undue hardship on her employer. We therefore conclude that the evidence substantially supports the MCAD's decision that the school committee discriminated against Woodason because of her handicap.

c. *Damages.* The school committee claims that it was error to award Woodason damages for emotional distress, back pay, and lost pension benefits and to order the school committee to conduct MCAD-approved training sessions for school officials "who make determinations regarding medical leaves of absence, use of sick time, accommodations to disabled employees and termination." "On a finding of discrimination, the commission has the authority to grant such relief as is appropriate . . . . The formulation of the type of relief appropriate in a particular case is within the commission's discretion, provided any damages awarded are supported by substantial evidence" (citations omitted). *Wynn & Wynn, P.C.* v. *Massachusetts Commn. Against Discrimination*, 431 Mass. 655, 674 (2000). See G. L. c. 151B, § 5.

The Supreme Judicial Court recently held that an emotional distress award

> "must rest on substantial evidence and its factual basis must be made clear on the record. Some factors that should be considered include (1) the nature and character of the alleged harm; (2) the severity of the harm; (3) the length of time the plaintiff has suffered . . . ; and (4) whether the complainant has attempted to mitigate the harm (e.g., by counselling or by taking medication)."

*Stonehill College* v. *Massachusetts Commn. Against Discrimination*, 441 Mass. 549, 576 (2004). Here, Woodason presented evidence — which the hearing officer used in her findings — that she "loved her job," the firing from which was "devastating and humiliating" and which caused her to suffer from panic attacks and lose her appetite, her hair, and twenty percent of her body weight (from 103 to 83 pounds). Woodason also saw a psychologist until her medical insurance benefits ran out. Based on this evidence, the MCAD was within its discretion to award emotional distress damages of $50,000.

Regarding Woodason's back pay award, the hearing officer acted within her discretion to decline to offset any unemployment benefits received by Woodason. *Buckley Nursing Home, Inc.* v. *Massachusetts Commn. Against Discrimination*, 20 Mass. App. Ct. 172, 183 (1985), quoting from *Jones* v. *Wayland*, 374 Mass. 249, 262 (1978) (applying "collateral source rule" to employment discrimination context because "if there is to be a 'windfall,' such benefit should accrue to the injured party rather than to the wrongdoer"). With respect to the lost pension benefit award, the school committee claims that it is purely speculative. Woodason and her husband testified, however, that she intended to retire at the close of the 2002-2003 school year. She then presented calculations by an actuarial expert of the net value of her lost pension benefits based on this retirement date. See *Talbert Trading Co.* v. *Massachusetts Commn. Against Discrimination*, 37 Mass. App. Ct. 56, 65 (1994) (claimant entitled to potential pension benefits as "they represent a tangible loss to him and a benefit that would have inured to him but for the unlawful termination by the employer"). The school committee offered no evidence to rebut this evidence and minimal legal

argument. The hearing officer's award must therefore stand. Likewise, the order that the school committee conduct training sessions on reasonable accommodations was within the MCAD's discretion to formulate appropriate relief. See *Chief Justice for the Admn. and Mgmt. of the Trial Court* v. *Massachusetts Commn. Against Discrimination*, 439 Mass. 729, 737 (2003).

d. *Attorney's fees.* General Laws c. 151B, § 5, provides that "the commission shall award reasonable attorney's fees and costs to any prevailing complainant." The MCAD's decision to award fees in the amount of $74,760.50 was discretionary; judicial review is therefore limited to whether the MCAD exceeded or abused its discretion. See *Fontaine* v. *Ebtec Corp.*, 415 Mass. 309, 324 (1993) ("The amount of a reasonable attorney's fee . . . is largely discretionary with the judge, who is in the best position to determine how much time was reasonably spent on a case, and the fair value of the attorney's services. We determine the limits within which this discretion may be exercised"); *Wynn & Wynn, P.C.* v. *Massachusetts Commn. Against Discrimination*, 431 Mass. at 676 (MCAD decision granted same discretion).

When Woodason's attorney initially took her case in January, 1998, he worked at a small firm and billed at an hourly rate of $170. Two months before the public hearing, in November, 2000, he joined the employment, labor, and benefits section of a major Boston firm, where he billed at $330 per hour. Woodason's attorney provided extensive, uncontested evidence of the time spent on the case. In addition, he submitted affidavits by three practicing attorneys who placed the reasonable value of his services at $200 per hour for prehearing work at the first firm and $275 for hearing and posthearing work at the larger firm. The school committee provided no countervailing evidence to support its claim that these figures were unreasonable.

The MCAD calculated the attorney's fees by using the "lodestar method," an amount "calculated by multiplying the number of hours reasonably spent on the case times a reasonable hourly rate." *Fontaine* v. *Ebtec Corp.*, *supra* at 324. The MCAD was well within its discretion to apply the lodestar method. *Id.* at 325-326. *Wynn & Wynn, P.C.*, *supra* at 676. Moreover, the MCAD did not adjust the resulting figure.

The trial court judge agreed with the MCAD's finding that the time spent on the case was both reasonable and efficient. However, he concluded that the rates requested by the attorney and eventually used by the commission ($200 and $275 per hour) were unreasonable as matter of law because they exceeded the attorney's billing hourly rate of $170 at the first firm. The judge reasoned that

> "[t]he case never changed, only the stature of her attorney changed and this should not become the defendant's burden. The MCAD was attempting to assess what was reasonable for a legal fee within the marketplace, and the best and only evidence presented was the hourly rate initially agreed to by Woodason and her counsel [i.e., $170]. . . ."

For its part, the school committee argues that neither the MCAD nor the trial court judge used the proper rates for determining the lodestar. Instead of the $200 and $275 rates used by the MCAD and the $170 rate mandated by the judge, the school committee argues that the rates at which Woodason was actually billed — sometimes as low as $135 and $150 — are appropriate, lest she receive an unjustified windfall. The school committee also argues that the lodestar figure should be reduced because Woodason's attorney only achieved limited success: the claims against Stanovich and Splaine were dismissed, and the total monetary damages awarded were only $83,565.42 (which does not, the school committee argues, justify an attorney's fee award of roughly ninety percent of that figure).[7]

The Supreme Judicial Court has ruled that "[a] fair market

---

[7]The school committee also claims that the MCAD did not sufficiently explain its calculation of reasonable attorney's fees. A decision-maker "must expose [its] thought process and show the method and manner underlying its decisional calculus . . . *especially . . . when the fee award departs substantially from the contours shaped by the application*"; however, "the explanation need not be painstaking" (emphasis supplied). *Coutin* v. *Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331, 337 (1st Cir. 1997). Here, the commission described the lodestar method and explicitly stated that it relied on the number of hours and rates provided by Woodason's attorney. Had it adjusted the lodestar significantly upward — as Woodason unsuccessfully urged the commission — or downward, then more elucidation might have been necessary. As that was not the case, we hold that the MCAD sufficiently explained its calculation of attorney's fees.

rate for time reasonably spent preparing and litigating a case is the basic measure of a reasonable attorney's fee." *Fontaine* v. *Ebtec Corp.*, *supra* at 326. "Calculation of reasonable hourly rates should begin with the average rates in the attorney's community for similar work done by attorneys of the same years' experience." *Stratos* v. *Department of Public Welfare*, 387 Mass. 312, 323 (1982). Furthermore, "where the award is provided for by statute and is assessed against the party having no contractual relationship with the attorney involved, the standard of reasonableness depends not on what the attorney usually charges but, rather, on what his services were objectively worth." *Heller* v. *Silverbranch Constr. Co.*, 376 Mass. 621, 629 (1978). Finally, these "[r]ates may differ according to the type of service performed — courtroom work, research, travel, or other tasks." *Stratos* v. *Department of Public Welfare*, *supra* at 323.[8]

Here, the MCAD explicitly stated that it relied on affidavits of three practicing attorneys who placed the market value of Woodason's attorney's services at $200 and $275 per hour for different types of work at the different firms.[9] The school committee provided no countervailing evidence to support its claim that those figures did not reflect the fair market rate or were otherwise unreasonable. While the facts and the legal theories of the case remained the same when Woodason's attorney changed firms in November, 2000, the nature of his work became more demanding with the preparation for and the prosecution of the public hearing. Whereas the prehearing work

---

[8]The First Circuit has found it appropriate to assign "different rates to different tasks" when determining the reasonable hours figure. *Alfonso* v. *Aufiero*, 66 F. Supp. 2d 183, 195 (D. Mass. 1999). Courts following this method distinguish between "core" legal work (e.g., "legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring, and implementation of court orders"), *ibid.*, quoting from *Brewster* v. *Dukakis*, 3 F.3d 488, 492 n.4 [1st Cir. 1993], and the less-demanding "noncore" (e.g., letter writing, telephone conversations, attending court hearings in a non-participatory capacity, and conferences with cocounsel). *Id.* at 196.

[9]All three lawyers had substantial experience in labor and employment law. They had practiced in at least four different firms and one of them served as a general counsel of a Massachusetts company. They all received Woodason's lawyer's billing records and at least one of them had prior working experience with Woodason's lawyer. They also were familiar with the billing rates charged for employment matters by other firms.

done before October, 2000, at the first firm involved mostly preliminary work, such as writing letters, researching the complaint, and preparing the joint certification memorandum, the work performed afterwards at the second firm was more labor-intensive and sophisticated due to the impending public hearing.

With his move to the larger firm, the attorney's support structure also improved. Although one cannot gain significant experience overnight, the attorney presented evidence that he developed his skills and stature in the employment law area over the three years of his representation of Woodason, which culminated in his being hired by a larger firm.[10] His improved reputation, stature, and support were factors that weighed in the attorney's favor when the MCAD assessed a reasonable billing rate. *Fontaine* v. *Ebtec Corp.*, 415 Mass. at 325. Given that the attorney provided substantial, uncontested evidence of the market value of his services, we hold that the MCAD was well within its discretion in using $200 and $275 rates to calculate the lodestar.

The school committee correctly points out that the results obtained by a claimant may affect the determination of attorney's fees; however, it incorrectly applies this principle to the facts of this case in requesting a downward adjustment of the lodestar. *Salem* v. *Massachusetts Commn. Against Discrimination*, 44 Mass. App. Ct. at 648 n.29, citing *Hensley* v. *Eckerhart*, 461 U.S. 424, 436 (1983) (a critical factor in determining reasonableness of fee award is degree of success obtained). See *Andrade* v. *Jamestown Hous. Authy.*, 82 F.3d 1179, 1191 (1st Cir. 1996) (court may adjust the lodestar by "award[ing] only that amount of fees that is reasonable in relation to the results obtained").

Prior to the public hearing, Woodason offered to settle the matter for $96,000, which the school committee rejected. Therefore, the receipt of $83,565.42 in monetary damages appears to represent a substantial success based on her

---

[10]The attorney's affidavit lists membership and service on various Massachusetts Bar Association (MBA) seminars and subcommittees relating to employment discrimination from 1998 to 2000, including on the MBA's MCAD Disability Discrimination Guidelines Subcommittee.

expectations. Furthermore, a significant attorney's fee may be upheld because of the "importance of providing an incentive to attorneys to represent litigants . . . who seek to vindicate . . . rights but whose claim may not result in substantial monetary compensation" and because of "the deterrent impact" of such litigation. *O'Connor* v. *Huard*, 117 F.3d 12, 18 (1st Cir. 1997), cert. denied, 552 U.S. 1047 (1998). See *Fontaine* v. *Ebtel Corp.*, 415 Mass. at 326 n.14. The fee-shifting provisions of G. L. c. 151B "aim[] to attract competent legal counsel for those with meritorious claims" yet limited means. *Fontaine* v. *Ebtec Corp.*, *supra* at 326. Finally, the hearing officer's dismissal of Woodason's claims against Stanovich and Splaine is not a reason to reduce the attorney's fees, because these claims were based on a common core of factual investigation and related legal theories. See, e.g., *Coutin* v. *Young & Rubicam Puerto Rico, Inc.*, 124 F.3d 331, 338 (1st Cir. 1997). We therefore hold that the MCAD acted within its discretion in not reducing the lodestar.

3. *Conclusion.* For the reasons discussed above, the judgment of the Superior Court shall be modified to provide that the decision of the MCAD is affirmed in all respects.

*So ordered.*