Botsford, Margot, J.
After a lengthy jury-waived trial and a decision dated March 23, 2005 (March 23 decision), that addressed most of the issues tried, there are three issues remaining. The first is the claim *18 the plaintiffs Louis Giuliano and GTWO, LLC (GTWO/MA)[3] that the defendant Plainville Racing Company, LLC (PRC) breached its lease with GTWO/MA. The second issue is the amount of dam-if any, that PRC in its role as a plaintiff in counterclaim is entitled to recover on account of the failure of GTWO/MA to provide a completed “turn key” racing facility. The final issue is the amount of attorfees and costs that the two sets of plaintiffs in counterclaim, (1) Gary Piantkowski, PRC, and Management Acquisition Company (MAC),[4] and (2) Ourway Really, LLC (Ourway), are entitled to recover account of their successful counterclaims under G.L.c. 93A, and, in Ourway’s case, its successful claims under a lease agreement with GTWO/MA.

I.The Giuliano Parties’ Claims Alleging Breach of Lease

Counts VI and VII of the Giuliano parties’ amended complaint respectively set out claims against PRC for declaratory judgment regarding the October 1, 1998, lease between PRC and GTWO/MA, and breach of contract in relation to that lease. Following the March 23 decision, in response to my inquiry about untried claims, the Giuliano parties submitted a memorandum asserting that the two lease-based claims set out in Counts VI and VII remain untried.[5] As Ourway and PRC have pointed out in their response to the plaintiffs’ memorandum, the record indicates that up until the March 23 decision, the Giuliano parties took the position that both these counts had been tried, and, in the Giuliano parties’ view, had been proved.[6]
Based on the trial record, I conclude that in the course of the trial the Giuliano parties tried or attempted to try the breach-of-lease claims set out in Counts VI and VII of their amended complaint. I also conclude that the Giuliano parties did not prove these claims by a preponderance of the evidence. I am not persuaded, for example, that there were problems with the pond created on the race track properly, or that even assuming there were problem(s) with the pond, that problem or those problems constituted a breach of the lease. (There was also no proof of damages resulting from the alleged breach.) The same points hold true concerning the plaintiffs’ claim concerning fleas, and claim that PRC was in violation of Section 10 in the lease (see trial ex. 15). As for rental payments, the evidence indicates that Giuliano had agreed that rent would not be due until the race track facility opened or live racing began at the track. There was no proof that PRC did not make all the rental payments required.

II. PRC’s Breach of Contract

Damages (Turn Key Facility)

The March 23 decision concluded that the PRC parties had proved the counterclaim that GTWO/MA failed to provide a completed turn key race track facility by April of 1999, in breach of the lease agreement between GTWO/MA and PRC. I suggested in the decision that further discussion would be helpful concerning the damages sustained by PRC on account of breach. In a subsequent memorandum, the PRC parties claim $217,232.29 as damages, describing sum as “cover work” necessary to complete the race track facility in accordance with the plans and specifications that had been connected with the lease agreement and submitted to the State Racing Commission. (These appear as Exhibit 1558A.) The Giuliano parties oppose this requested damage award, contending that the claimed damages have not been proved.
I consider here the six separate areas of damages advanced by the PRC parties.

1. Work on

I have reviewed the pertinent portions of Russell Paige’s transcript and examined the pages of ex. 1558A on which PRC relies. I conclude that PRC has adequately established that Douglas Lumber performed the claimed work to cover for unfinished work of GTWO/MA. I will allow the $24,587.78 claimed by PRC.[7]
With respect to the claim Robert Paige, the brother of Russell Paige, I conclude that the documentation was confusing and not sufficiently tied to the original plans or to work GTWO/MA was supposed to have completed but failed to complete. Moreover, the lack of detail and of supporting documentary evidence is particularly troubling because the person who is claimed to have performed the work is so closely tied to the only witness on this point, Russell Paige. The $15,031 in damages sought in connection with Robert Paige’s work will not be allowed as damages.

2.Work on Clubhouse

The amount claimed for work by Douglas Floorcovering will be allowed except for $1,015 for carpeting in the president’s office, given Russell Paige’s lack of certainty whether that carpeting had been ordered by Patricia Lett. The total allowed for the Douglas Floorcovering work is therefore $7,875. The total amount claimed for payments to Nappa Building Corp., $8,641.88, will be allowed. The total damages for work on the clubhouse come to $16,516.88.

3.Work on the Track

PRC seeks $18,436.13 paid to Gravel (Boro). The documentation offered does not provide sufficient support for the claim that this sum was paid to complete work that was part of the original specifications. The principal Boro invoice included by PRC is for approximately $27,000, but PRC seeks to recover only $18,436.36. There is no indication how the amount claimed and the invoice go together. Paige testified that the invoice for most of the Boro work was missing, and he had no explanation for why. The job tickets submitted — presumably connected to the missing invoice — are dated between April 8, 1999, and *19 approximately May 10, 1999; both of these dates are before Giuliano is claimed to have left the site. In sum, I cannot find that PRC has proved its claim for $18,436.36 in damages connected to Boro’s work, and will not allow this sum as part of the contract damages.
PRC also seeks to recover $22,180 paid to Bostonian Hauling for hauling loam to the infield. While the Giuliano parties argue that the infield is not included in the original plans, I disagree.[8] Of this total, $13,680 (invoices for $6,200 and $7,480) will be allowed as damages. The necessary links between the remaining invoices and checks offered by PRC was not established.[9]

4.Work for Paving and Grading

The PRC parties seek to recover $6,030.86 paid to Lorusso Corporation. However, I fail to discern a persuasive connection between the checks and the invoices at issue. Moreover, the contact included in ex. 1630A about which Russell Paige testified is actually a proposal dated December 1, 1999, proposing work to be completed in the following 30 days, and the checks in evidence (ex. 1630B) are dated September 3 and December 3, 1999. They thus seem unconnected to the contract proposal.[10] The claimed $6,030.86 will not be included in the breach of contract damages.
PRC also seeks $92,408 paid to Child Construction. However, it is not clear whether this work was necessary to complete work that GTWO/MA was ultimately supposed to perform. Russell Paige testified that paving the south parking lot was part of the original specifications but then dropped because of “cost measures.” (Testimony of Russell Paige, April 1, 2004, Tr. vol. 14, p. 147.) There is no evidence as to when the decision to drop the south parking lot paving was made, or whether or not PRC acquiesced in it — thereby creating a subsequent modification of the original contract. I find the lack of clarity sufficiently troubling to warrant disallowance of this amount as damages.
5. Fire Protection
PRC seeks $3400 paid to FireGuard. The record supports this damage claim. It will be allowed.

6. Electrical Work

The claim for cover work related to unfinished electrical work comes to $17,626.84. I have reviewed the invoices and checks as well as ex. 1558A and the testimony of Russell Paige on the subject. I accept that electrical work in the bam should be included, even though this work is not part of the specifications in ex. 1558A. Nevertheless, the connection between invoices and checks is again elusive. Based on my review, I conclude that the damages in this categoiy that have been sufficiently proved total $9713.75.[11]

7.Total Contract Damages

Based on the above, the total contract damages to be awarded to PRC against GTWO /MA for breach of the lease agreement’s obligation to provide a turn key facility are $67,898.41.

III. Attorneys Fees and Costs on Chapter 93A Counterclaims

A. The PRC Parties’ Claim for Attorneys Fees and Costs

1. Introduction: Entitlement to Fees and Costs

I determined in the March 23 decision that the PRC parties proved their counterclaim under G.L.c. 93A, § 11,[12] against Giuliano and GTWO/MA, insofar as the counterclaim concerns the Giuliano parties’ unfair or deceptive representations about ownership of the racetrack property in Plainville, Massachusetts, and also as it concerns the plaintiffs’ misrepresentations about and deceptive use of funds paid by PRC to GTWO/MA for the construction of the race track facility. Although the March 23 decision did not discuss the PRC parties’ claim of fraudulent inducement relating to the signing of the so-called “stock-related agreements”[13] directly in connection with their c. 93A counterclaim, the fraudulent inducement claim is included in that counterclaim. (See PRC parties’ Counterclaims, M87-95; 129, 130(6)-133.)
In order to recover for a claim under c. 93A, §11, a party must establish that it has “suffer(ed) ... a loss of money or property” as a result of the alleged unfair or deceptive conduct. If there is no such loss, then a §11 plaintiff is not entitled to recover attorneys fees and costs. See Jet Line Servs., Inc. v. American Employers’ Ins. Co., 404 Mass. 706, 718 (1989). In the March 23 decision, I raised the question whether the PRC parties had suffered any loss in relation to their c. 93A claim about Giuliano’s year of misrepresenting that he owned the Plainville property. (March 23 decision, p. 43.) The PRC parties have responded by pointing out that apart from everything else, PRC paid rent to GTWO/MA between March 1999 and February 2000, at an annual rental level of $980,000, an amount based on the terms of the October 1, 1998 lease which provided for a 30-year lease term, and— through an addendum to lease executed on the same day — an option on the part of PRC to purchase the race track property at any time during the 30-year lease term. The argument is that the rent actually paid by PRC during the time in question was far in excess of what PRC would have paid if PRC had known that in fact its lease was for no more than fourteen months, and that it likely had no valid option to purchase.[14]
I accept the PRC parties’ position that PRC did suffer a loss of money in the form of excessive rent to GTWO/MA during 1999-2000. That there was loss of money seems to be the logical conclusion to draw from the fact that the annual rent was set on the of a lease almost 30 times as long as the actual “sublease” into which Giuliano secretly transformed original PRC October 1, 1998, lease. No business business person would pay the same amount of annual rent for a 14-month lease of a race track *20 property as the business or person would pay for a 30-year lease, especially if, as in this case, long-term control of the property by the lessee was an essential feature of the lease. Cf. Diamond Crystal Brands, Inc. Blackleaf, LLC, 60 Mass.App.Ct. 502, 504, 508-09 (2004) (where lessee was required to pay electricity expenses under lease far in excess of its actual electricity costs, lessee was entitled to excess as damages under lease and under c. 93A). It is not critical that did not prove the actual amount of the loss suffered; what must be shown is that there was an actual adverse economic effect on PRC, even if it was quantified in dollars and cents. See Jet Line Servs., v. American Employers Ins. Co., supra, 404 Mass, 718. Compare Tech Plus, Inc. v. Ansel, 59 Mass.App.Ct. 12, 19-21 (2003). Compare also Cummings v. HPG Intern, Inc., 244 F.3d 16, 27 (1st Cir. 2001). PRC has met its burden of proving economic loss.
Moreover, as mentioned at the beginning of this fee discussion, one of the PRC parties’ c. 93A claims concerned the stock-related agreements relating to PRC that Giuliano fraudulently induced Piantkowski to execute. The intentional misrepresentations of Giuliano that served as the inducing agents were “deceptive” within the meaning of Chapter 93A. See, e.g., McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 712-13, 714(1990). See generally Aspinall v. Philip Morris Cos., Inc., 442 Mass. 381, 394 (2004). I have previously concluded that the PRC parties are entitled to rescission of the three stock-related agreements on account of the fraudulent inducement (see March 23 decision, pp. 36-37). Rescission is an appropriate remedy under Chapter 93A. See, e.g., Schwartz v. Rose, 418 Mass. 41, 47-48 (1994); Ann & Hope, Inc. v. Muratore, 42 Mass.App.Ct. 223, 230-34 (1997). Where rescission is ordered, the prevailing party’s right to actual monetaiy damages is limited to “the losses [if any] suffered .. . because of the interruption in the status quo.” Schwartz v. Rose, 418 Mass. at 47-48. However, even if there are no monetaiy damages in a c. 93A case where rescission is ordered, c. 93A, §11, makes clear that the party may still recover reasonable attorneys fees. See c. 93A, § 11, ¶6 (“[i]f the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys fees and costs incurred in such action”). Accordingly, the PRO parties have a valid claim to recover attorneys fees relating to their successful claim for rescission of the stock-related agreements. The significance of this point is that the factual basis of this claim — Giuliano’s misrepresentations that he needed the stock-related agreements to secure the 30-year lease between GTWO/MA. and PRC — has at its center the basic misrepresentation by Giuliano that he (through GTWO/MA) owned the race track property. Thus the question of whether parties’ lack of proof of specific monetaiy relating to their c. 93A claim based directly on misrepresentation may not require consideration any event, because the PRC parties’ right to recover attorneys fees in connection with their claim relating the stock-related documents allows them to seek reasonable fees covering claims that have the same underpinnings. Cf. Office One, Inc. v. Lopez, Mass. 113, 126 n.17 (2002) (separate counts in a complaint alleging violation of c. 93A and other causes action need not “be apportioned when they arise a single chain of events or involve a common core facts”); Clamp-All Corp. v. Foresta, 53 Mass.App.Ct. 813, rev. denied, 436 Mass. 1104 (2002) (same).[15]
The PRC parties’ other c. 93A related to Giuliano’s improper use of funds that PRC provided to GTWO/MA for construction of the race track facility. (See March 23 decision, pp. 43-50.) There is no question that the PRC parties established loss of money as a result of Giuliano’s unfair or deceptive conduct, and are entitled to attorneys fees and costs related to the prosecution of this claim.[16]

2. Overview of the PRC

The PRC parties seek an award attorneys fees and costs in the amount of $28,238.87. reviewing the fee request, I have considered the factors set out in Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 629 (1978), and Linthicum v. Archambault, 379 Mass. 381, 388-89 (1979).[17] I will briefly review them as a group. See, e.g., Berman v. Linnane, 434 Mass. 301, 303 (2001). See also WHTR Real Estate Limited Partnership v. Venture Distrib., Inc., 63 Mass.App.Ct. 229, 237 (2005).
This is a case an trial histoiy, and one that was hard fought on all sides. The plaintiffs’ complaint was filed in November 1999 in Norfolk County, but the complaint followed the filing of a related case by the PRC parties against Giuliano and GTWO/MA one month earlier in the same county; the earlier complaint was in substance joined with this case. The factual underpinnings changed and were made more complicated as time went on because of, among other reasons, settlement agreements relating to the race track property between and among Realty Financial Partners (REP), the Giuliano parties and others in 2000, and Ourway’s entrance into the fray. But of greater significance is the fact that at the center of his case are a series of charges and countercharges of misrepresentation, deceit and fabrication involving Giuliano, Piantkowski, their respective entities, and the enigmatic Russell Paige, who appeared first as a central Giuliano employee and confidant, and ended as a central PRC employee with close ties to Piantkowski. The task of untangling the snarled set of stories and facts surrounding the so-called first amendment to lease and lease confirmation and acknowledgment was one that consumed enormous time *21 by all concerned. The motion practice in this case, from frequent discovery motions to motions to dismiss and for partial summary judgment, was intense and frequent, as a review of the voluminous Norfolk County docket entries will quickly confirm. In fact, the discovery disputes became so difficult that a discovery master was appointed, retired Justice Robert Stead-man, who spent a very significant amount of time on discovery over the course of more than a year. In addition, discovery issues led to the filing of ancillary litigation in Rhode Island in an effort to obtain, inter alia, financial records of Giuliano and GTWO/MA. The trial of the case was all set to commence in March 2003 in Norfolk Couniy, but the case was transferred to the business litigation session of Suffolk County Superior Court on the trial date. Thereafter, when the jury-waived trial did actually begin in September 2003, it lasted for 30 trial days, spread out over nine months because of scheduling issues.
The case presented a host of complicated and disputed factual issues above all, and investigation as well as presentation and proof required significant investments of time and focus. There were also, however, a number of legal issues to confront, as shown by the summary judgment decisions of Judge Brady (dealing with the legal responsibility of the Giuliano parties under the lease with REP for the mechanics liens) and Judge Donovan (dealing with the interpretation of the stock-related agreements),[18] as well as the legal issues considered in the March 23 decision. In sum, while I conclude below that the attorneys representing the PRC parties are not entitled to recover for all the time they spent preparing and trying this case, there can be no question that the case presented those attorneys with a difficult morass of facts to sort out and legal issues that these facts inevitably spun off.
Turning to results, obviously the PRC parties (as well as Ourway) prevailed on most of their claims. The damages that the PRC parties obtained are not enormous in the scheme of things, but rescission of the stock-related agreements represents a significant victory. At the end of the day, Ourway — almost all of whose members were also the members of PRC — is in control of the Plainville race track and facilities,[19] and Giuliano no longer has any connection to either the property or the track.
The next factor is the competence, experience and reputation of the attorneys. The PRC parties have been represented throughout this litigation by attorneys and their paralegal assistants at Mintz Levin, Cohn, Ferris, Glovsky and Popeo, P.C. (Mintz Levin), a respected and competent Boston law firm. The lead trial attorney was Jeffrey Robbins, and Rosemary Allen has also worked on this case from the beginning through to the end, both of them assisted by three to five different associates who have each worked extensively on ihe case for shorter periods of time. In addition, a substantial group of other partners and associates in the firm have participated on a more intermittent basis. Trial counsel were always well prepared and in command of the material (an observation that applies to counsel for all parties).
Finally, with respect to the computation of fees, I have applied the lodestar method, multiplying the number of hours reasonably spent by what I have determined to be a reasonable hourly rate. See, e.g., Fontaine v. Ebtec Corp., 415 Mass. 309, 324 (1993). See also School Committee of Norton v. Massachusetts Comm’n Against Discrimination, 63 Mass.App.Ct. 839, 851-52 (2005). This has been somewhat complicated in relation to the attorneys at Mintz Levin because, as the affidavit of Stephen Veazey, Mintz Levin’s chief operating officer, shows, the hourly fee rates of the Mintz Levin attorneys has frequently changed over the life of this case. I have considered the hourly fee rates of these attorneys in light of the affidavits concerning fees filed both by Stephen Veazey and a number of the attorneys in the firm who worked on the case, and also in light of the fee affidavits filed by the attorneys from Todd & Weld who represented Ourway, keeping in mind the reputation of both Mintz Levin and Todd & Weld as excellent firms in Boston whose lawyers are skilled at handling complex litigation. I have also kept in mind my general knowledge about the hourly rates of private civil litigators practicing law in the City of Boston.
Mintz Levin has divided the fee application into discrete time periods, and I have tried to do so as well, making some adjustments to those Mintz Levin used. Thus, I have considered the period (1) from the filing of the complaint in Norfolk County in November 1999 until approximately August of 2001, when Timothy Henseler, the then principal Mintz Levin associate working on the case, appears to have transferred primary responsibility to Paul Poth, and when in addition the firm instituted a revised structure of hourly fees for certain attorneys, including Jeffrey Robbins and Rosemary Allen; (2) from August 2001 until March 10, 2003, when the case moved from Norfolk to Suffolk Superior Court for trial; (3) from March 2003 through the trial and filing of the post-trial briefs in the summer of2004; and (4) covering the preparation of the fee application. My determination of reasonable hourly fees for the lawyers concerned, and reasonable time spent, is discussed below.

3. Additional Considerations and Adjustments Relating to the Mintz Levin Fee Request

a. Mintz Levin has had many lawyers and paralegals work on this case during the past six years; the affidavit of Stephen Veazey lists eleven attorneys and four paralegals, and a review of the billing records reflects a good number more who performed some legal services relating to the case, although less frequently or consistently than the attorneys who are listed in the Veazey affidavit. I have not included all *22 the time of all the attorneys and paralegals who worked on the case. Rather, I have limited the numbers to the principal three attorneys who handled the case during any particular period, and have included as well paralegal services in each period. For the trial itself, the PRC parties had at least four attorneys at the trial every day, and sometimes more. However, I have included only the three primary trial attorneys: Jeffrey Robbins, Rosemary Allen, and Joseph Lipchitz. I made these adjustments in an effort to arrive at a fee award that is reasonable in the context of a fee-shifting case; my review of the billing records does suggest that even though this was a long, complicated and very contentious case, the contentiousness was hardly limited to the Giuliano parties, and the number of Mintz Levin attorneys and hours devoted to this case was overkill. Moreover, the interests of Ourway and the PRC parties were generally aligned in this litigation, and accordingly, Ourway’s attorneys were generally supporting and adding to the legal services provided by Mintz Levin to the PRC parties.
b. There are certain areas of work reflected in the fee application that I have excluded from the fee award. Thus, I attempted to cut out the time spent on the investigation of Russell Paige’s account of the lease confirmation and acknowledgment (LCA), since this was one aspect of the PRC parties’ c. 93A claim on which they did not prevail.[20] It appeared that there were a few proceedings in other courts — e.g., a summary process proceeding, and an appeal involving Norfolk Harness, LLC — that seemed insufficiently connected to this case to be included in the fee award.[21] I have also attempted to eliminate work done on the breach of contract issues relating to the claim that GTWO/MA failed to deliver a completed turn key facilily by April 1999, because it was not factually or legally connected to the PRC parties’ c. 93A claims. In addition, in my judgment, a number of the pre-trial motions and motions in limine brought before me by the PRC parties were without substantial merit, and I have not included time spent preparing those motions.
I have also tried to eliminate much of the attorney time spent preparing for the trial that was to have commenced on March 10, 2003, in Norfolk County, because the cancellation of the trial and transfer of the case to Suffolk County, while certainly not the responsibility or fault of the PRC parties (or Ourway), were also not the fault of the Giuliano parties. The eleventh or twelfth hour move caused all parties to engage in trial preparation work that presumably had to be largely repeated at a later time, but this was an unfortunate consequence that equally affected eveiyone, and it does not seem appropriate to charge the Giuliano parties for it as part of the fee-shifting process.
Finally, I have reduced to varying degrees the number of hours for each of the covered attorneys and paralegals in each of the time periods to eliminate what appeared to be excessive time spent on the tasks at hand.
c. The result of these different adjustments leads to the following:

(i)First Phase: From the Filing of the Complaint to August 2001

The attorneys covered in this period included Jeffrey Robbins, for whom I used an hourly fee of $325; Rosemary Allen, with an hourly fee of $285; and Timothy Henseler, with an hourly fee of $150. The paralegal rate used was $115 per hour. The total fees for this phase come to $535,320.00.

(ii)Second Phase: From August 2001 to March 10, 2003

The attorneys covered in this period included Jeffrey Robbins, for whom I used an hourly fee of $375; Rosemary Allen, with an hourly fee of $335; Paul Poth (from August 2001 to approximately November 2002), with an hourly fee of $190; and Joseph Lipchitz (from November 5, 2002, to March 10, 2003), with an hourly fee of $230. The hourly paralegal rate used was $120. The total fees for this phase are $395,427.50.

(iii)Third Phase: From March 11, 2003 Through Preparation of Post-trial Briefs, July 2004

The attorneys covered in this period included Jeffrey Robbins, with an hourly rate of $395; Rosemary Allen, with an hourly rate of $350; and Joseph Lipchitz, with an hourly rate of $280. The hourly rate for paralegal time was $125. The total fees for this phase come to $588,100.00.
fivj Fees for Preparation of the Fee Application
The PRC parties seek $52,783.50 in fees to cover 162 hours of work done to prepare this fee application. I consider the time spent on this task and the fees sought to be excessive: The total fees to be awarded for preparing the fee application will be $20,000, which is reasonably in line with the fees that Todd & Weld will recover for preparing their fee application.

(v)Attorneys fee award

The attorneys fee award to the PRC parties is $1,538,847.50.

(vi)Costs

The PRC parties seek $28,238.87 in costs. The costs in question cover depositions, process server expenses, subpoena services, filing fees, copying and certified copy costs. The plaintiffs do not raise any objection about these costs, and they appear reasonable. They will be allowed in full.

(vii)Total Award for Reasonable Attorneys Fees and Costs

The PRC parties’ total award for reasonable attorneys fees and costs is $1,567,086.37.
B. Ourway’s Application for Fees and Costs

1. Introduction

Ourway seeks to recover its attorneys fees and costs in relation to its successful counterclaims that dealt with breaches of the lease between GTWO/MA and Ourway’s *23 assignor RFP, as well as the counterclaims raising violations of G.L.c. 93A by the Giuliano parties, and the claim of alter ego or corporate disregard, namely, the claim that the corporate identity of GTWO/MA should be set aside and Giuliano held liable for all judgments against GTWO/MA. The amount of damages that have been awarded to Ourway on these breach of contract and c. 93A claims totals $1,191,769.19.[22] Ourway seeks an award of attorneys fees of $751,669.50, and costs in the amount of $13,870.75.
There is no dispute that Ourway is entitled to recover reasonable attorneys fees and costs connected to its successful breach of lease claims against GTWO/MA as the assignee of the lessor RFP. (See lease, ¶14.5.) Clearly Ourway may also recover reasonable attorneys fees for its successful c. 93A claims. See G.L.c. 93A, §11.1 also agree with Ourway that the fees associated with its alter ego/corporate disregard claim are recoverable either under the lease — because proof of the alter ego relationship .between Giuliano and GTWO/MA was necessary to “enforc[e] its rights”[23] against GTWO/MA — or under c. 93A, because the claim is so closely intertwined with the unfair or deceptive conduct at issue.
In connection with the PRC parties’ fee application, I reviewed above the factors that bear on the award of reasonable attorneys fees under c. 93A. Essentially the same factors are also relevant to an award of fees under the terms of a lease or other contract. See, e.g., WHTR Real Estate Limited Partnership v. Venture Distrib., Inc., supra, 63 Mass.App.Ct. at 236-37. There is no need to repeat the factor review here except to state that I have considered all the previously-discussed factors in relation to Ourway’s fee request, and that with respect to the factor of usual fees charged for similar services by attorneys in Boston, the hourly fee rates charged and sought by the Todd & Weld attorneys representing Ourway — principally Owen Todd, Kathleen Genova and David Rich — are substantially lower than the rates charged by many if not most medium- and large-size firms in the ciiy that perform comparable services in complex civil cases. I have considered the average hourly rates for each attorney, and consider those rates to be more than reasonable; Giuliano parties do not contend otherwise.[24] When calculating the attorney fee award, I have used the hourly rates charged by each of the attorneys in question, as reflected on the printout of time charges attached to the affidavit of Kathleen Genova.
2.Additional Considerations and Adjustments Relating to the Todd & Weld Fee Application
For the same reasons that applied to the PRC parties’ fee request, I have reduced the Ourway fee request by eliminating much of the fees related to preparation for the trial originally scheduled for March 2003, but then cancelled.[25] I have also adjusted the request to cut some (not all) of the time spent on Russell Paige. Ourway contends that it was necessary for its attorneys to spend time on “Mr. Paige’s issues” because the credibility of his testimony was important to the proof of Ourway’s c. 93A counterclaims, including the claim about the impropriety of draw down request no. 10, and the unfair and deceptive sale of sand and gravel from the Plainville property. I agree with this analysis at least insofar as Mr. Paige’s invocation of the Fifth Amendment privilege is concerned, but particularly after Mr. Paige waived the privilege, Russell Paige’s “issues” included some key ones that solely related to Giuliano’s relationship and interactions with Piantkowski and PRC, and had no connection to Ourway’s claims.[26]
The Giuliano parties argue that Ourway’s principal claim — at least as measured by the damages awarded— was the lease-based claim relating to the mechanics liens, and this was decided by partial summary judgment in 2001, long before the trial. Accordingly, the Giuliano parties state, Ourway’s fee request should be reduced, presumably because the proceedings in the case after the partial summary judgment decision, including the trial itself, had nothing to do with this claim at all. The argument fails. Ourway’s c. 93A claims and its related alter ego claim were not resolved before trial, needed to be tried, and were intertwined with each other.[27] The alter ego claim was pressed both by Ourway and the PRC parties, and its proof depended on evidence presented throughout the trial. As the plaintiffs acknowledge, Ourway’s fee application reflects an effort on its part to eliminate fees that are not fairly related to its set of successful lease-based or c. 93A claims. Further apportionment is not necessary. See, e.g., Clamp-All Corp. v. Foresta, supra, 53 Mass.App.Ct. at 813.
Finally, Ourway’s fee application includes the fees it seeks for services performed by Todd & Weld, and also fees that were paid to Rhode Island counsel that Todd & Weld engaged to pursue necessary discovery in that state. The total fees sought for the work of Rhode Island counsel is $15,000, which is described as covering 60 hours of work by the Rhode Island attorney, Robert Goldberg, at $250 per hour. The plaintiffs do not question this particular portion of the fee application. I accept that the Rhode Island discovery was necessary for this case and accept the hourly fee and hours spent as reasonable without any adjustment.

3.Ourway Fee Award

Ourway has not divided its fee application into distinct phases, and I have not done so either. The attorneys fees to be awarded to Ourway are $647,396.50. This sum includes the $15,000 that covers the legal services provided by Rhode Island counsel.

4.Costs

Ourway seeks to recover costs in the amount of $13,870.75. Included here are the costs of deposition transcripts, service of process and witness fees, as well as costs for chalks and blow-ups. No challenge to or *24 question about these costs has been raised, they appear reasonable, and they will be allowed in full.
5. Total Award for Reasonable Attorneys Fees and Costs
The total award to Ourway for its attorneys fees and costs comes to $661,267.25.

ORDER

For the foregoing reasons, it is ordered that the final judgment in this case on Count VI of the plaintiffs’ amended complaint is to declare that PRC was not in default on or in breach of the October 1, 1998 lease between Plainville Racing Company (PRC) and GTWO, LLC (GTWO/MA), and Count VII is to be dismissed. It is further ordered that the plaintiff in counterclaim PRC recover of the plaintiffs on its breach of contract counterclaim damages in the amount of $67,898.41. It is further ordered that in connection with their counterclaim under G.L.c. 93A, the PRC parties be awarded reasonable attorneys fees and costs in the amount of $1,567,086.37. It is further ordered that in connection with its lease-based counterclaims and counterclaim under G.L.c. 93A, Ourway, LLC be awarded reasonable attorneys fees and costs in the amount of $661,267.25.

Louis Giuliano and GTWO/MA are referred to collectively as “the Giuliano parties” or “the plaintiffs.”

 Gary Piantkowski, PRC and MAC are collectively referred to as “the PRC parties.”

 See Plaintiffs’ Memorandum Regarding Outstanding, Untried Claims, dated May 23, 2005.

 See Ourway Realty, LLC and the PRC Parties’ Response to the Plaintiffs’ Memorandum Regarding “Outstanding, Untried Claims,” dated May 27, 2005, exhibits B, C, and D.

 Despite the argument to the contrary by the Giuliano parties, I creditthe evidence that the paddock work performed by Douglas Lumber was part of the original plans and specifications.

 The fact that infield work was not included in the work to be performed originally by Walsh Construction (Paige testimony, April 1, 2004, Tr. vol. 14, p. 148) does not by itself indicate that the work was not in the original plans.

 I note, for example, that the total checks made out to Bostonian Hauling that the PRC parties offered — $21,180 (ex. 1627B) — come to less, than the Bostonian Hauling invoices in evidence — $23,120 (ex. 1627A) — with no explanation for the discrepancy.

 I note as well that the December 3, 1999, check is described as covering the cost of blacktop around manhole covers. The link between manhole covers and the work Lorusso was described as having done is not explained.

 This total includes $2,112.44 billed on invoice 002303, dated June 15, 1999; $3,871.07 billed on invoice 002310, dated July 27, 1999; $963.85 billed on invoice 002337, dated September 22, 1999; $708.41 billed on invoice 002340, dated October 4, 1999; and $2,057.98 billed on a statement dated November 9, 1999. (See ex. 1633A and 1633B.)

 The c. 93A counterclaim appears as Count VII of the PRC parties’ counterclaims.

 These include two sets of a stock pledge agreement, stock purchase agreement, and escrow agreement, one set of which Piantkowski executed individually on December 9, 1998, and the second set of which Piantkowski executed on behalf of MAC in May of 1999.

 The PRC parties point out that they had rejected as excessive a proposal by Giuliano that the rent be established at $980,000 annually for a five-year lease term.

 In light of this conclusion, I do not reach the PRC parties’ argument that they are entitled to their attorneys fees directly as damages under the principles set forth in Columbia Chiropractic Group, Inc. v. Trust Ins. Co., 430 Mass. 60, 63-65 (1999).

 The damages awarded were $266,048.17, doubled to $532,096.34 on account of the plaintiffs’ knowing or wilful violations of c. 93A.

 These factors include: “(1) how long the trial lasted, (2) the difficulty of the legal and factual issues involved, and (3) the degree of competence demonstrated by the attorney!,]” Heller v. Silverbranch Constr. Corp., 376 Mass. 621, 629 (1978); and, in a somewhat overlapping and longer list, “(4) the nature of the case and the issues presented, [5] the time and labor required, [6] the amount of damages involved, [7] the result obtained, [8] the experience, reputation and ability of the attorney, [9] the usual price charged for similar services by other attorneys in the same area, and [10] the amount of awards in similar cases.” Linthicum v. Archambault, 379 Mass. 381, 388-89 (1981). See Romaine v. Ebtec Corp., 415 Mass. 309, 324-25 (1993).

 See, as to the latter, Giuliano v. Piantkowski, 62 Mass. 932 (2004).

 I have been informed that PRC is no longer the licensee of the race track, and that the license currently stands in the name of Ourway. This change in PRC’s status as licensee has not been suggested to be the result of a litigation failure on the part of the PRC parties in this case.

 As the March 23 decision indicates, the Giuliano parties did not prevail on its claim relating to the LCA either. In short, neither side sustained the burden of proof applicable to its claim.

 I have not excluded proceedings in Rhode Island to seek discovery; that discovery was very relevant to this case.

 This total includes $567,667.79 in damages that ajudge of this court (Brady, J.) awarded to Ourway on its breach of contract claim concerning mechanics’ liens, and $312,050.70 that I awarded on two of Ourway’s c. 93A claims, a figure that I doubled to $624,101.40 because of a finding that the Giuliano parties’ unfair or deceptive conduct was knowing or wilful.

 See Lease, ¶14.5.

 Ourway has submitted a sheet setting out the average hourly rates of the attorneys and assistants who worked on this case. I will not list all of the attorneys or rates, but the three principal attorneys’ average hourly rates were these; J. Owen Todd — $370.16; Kathleen M. Genova — $173.43; David Rich — $188.71.

 I did not eliminate all the time charged because it is reasonable to assume that portions of the trial preparation work done in advance of the March 2003 trial date could be, and were, used to prepare for the trial commenced in September 2003.

 I have also reduced the fee request to some extent by eliminating some of the pre-trial hours that seemed excessive.

 In addition, the facts related to Ourway’s c. 93A claims were also closely related to certain of the claims brought by the PRC parties about the Giuliano parties’ use of monies provided by PRC for construction of the race track facility.